**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| MARILYN KAYE FREEMAN,<br><br>                                    Petitioner,<br><br>vs.<br><br>MATTHEW CATE,<br><br>                                    Respondents. | Civil No.    10-1987 DMS (MDD)<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**(1) DENIAL OF PETITION AND**<br><br>**(2) DENIAL OF REQUEST FOR EVIDENTIARY HEARING** |
|---|---|

## I.    INTRODUCTION

Petitioner Marilyn K. Freeman ("Petitioner" or "Freeman") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which she challenges her San Diego Superior Court conviction in case number SC171601.  (ECF. No. 1.)  The Court submits this Report and Recommendation to United States District Judge Dana M. Sabraw pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

The Court has considered the Petition and Memorandum of Points and Authorities, Respondent's Answer and Memorandum of Points and Authorities, Petitioner's Traverse and Memorandum of Points and Authorities, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

-1-

## II.   **FACTUAL BACKGROUND**

The following statement of facts is taken from the California Court of Appeal opinion, *People v. Freeman*, Nos. D046394, D049238 slip op. (Cal. Ct. App. April 12, 2010). This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness). The facts as found by the state appellate court are as follows:

Child Endangerment and Battery

On the afternoon of September 10, 2002, Freeman's daughter, E., called 911 reporting that Freeman had hit her and thrown her against walls, such incidents had been happening all her life, and recently the frequency of the incidents had been increasing. E. explained that her mother home-schooled her and would lock her in the trailer where they resided. E. stated that about one hour earlier, her mother "grabbed [E.'s] head, . . . beat [it] against the wall and . . . hit . . . and yelled at [E.] . . ." E. was crying and afraid that when her mother returned home, "it [was going] to be even worse." E. told the dispatcher she had called her aunt and her aunt advised her to call 911.

About 50 minutes after the 911 call, Deputy Sheriff Margaret Barone spoke to E. on the phone. E. sounded very upset and frightened. About 15 minutes later, Deputy Barone arrived at E.'s residence. E. appeared terrified; her voice was cracking and her hands were shaking. Deputy Barone observed large welts on E.'s thigh and calf, bruising on her hip, and minor scratches on her arm. E. complained of pain to her forehead and shoulder.

E. told Deputy Barone that when she was sleeping on the couch that day, Freeman screamed and yelled at her to get up. Freeman kneed E. and started hitting and kicking her. During the struggle Freeman pushed E. and E.'s forehead hit the wall. When E. landed on the floor, her mother continued to kick her. E. managed to shove her mother off her; E. then ran out of the trailer and hid behind some bins. E. heard Freeman drive away, and then quickly drive back. Freeman yelled at E. to come out, but E. was too afraid. E. peeked around a corner of the bins and was terrified of the look on her mother's face.

E. told Deputy Barone that she first recalled being hit by her mother when she was three years old and she remembered the police being summoned about seven years ago. She stated the abuse had become progressively worse during the past year and had been almost a daily occurrence during the past six months. E. was concerned about what was going to happen when her mother returned home. Based on E.'s injuries, the potential for violence when Freeman returned, and E.'s level of fear, Deputy Barone took E. into protective custody. Deputy Barone expedited their departure without gathering any of E.'s belongings because E. was fearful and in a rush to leave. As they drove

away E. crouched down on the floor of the police vehicle, stating she did not want her mother to see her.

E. was taken to Green Oaks Ranch, a temporary placement facility. Nurse practitioner Lorrie York observed bruises on E.'s hip, thigh, and calf, and scratches on her back, arm and leg.

Foster Home Placement

On September 17, 2002, Child Protective Services (CPS) placed E. in the home of foster parents Vanessa Franco and Diana Gonzalez. Typically, a parent who is permitted unsupervised visitation is given the foster parents' phone number to arrange visitation. However, because of the protective issues, E.'s placement was confidential and Freeman was not given the foster parents' phone number. Franco was told that Freeman could have contact only with the social worker, and the social worker would convey any necessary information about E. to Franco.

When Franco met E., E. was very fearful and intimidated by everything around her. As Franco and E. were driving to eat lunch on the day of their first meeting, E. sank very low in her seat, almost to the floorboards, so that her head could not be seen above the window. Franco tried to reassure E. that her mother was not following her. While living in Franco's home, Franco described E. as suffering from "a beaten dog syndrome" and noted she would jump if she heard a loud noise and would flinch if spoken to in a high tone of voice. E. told Gonzalez and Franco that her mother had physically assaulted and tormented her for years, including kicking her, chasing her with a knife, pushing her into a brick wall, putting feces on her hairbrush, and threatening to kill her and make it look like suicide. E. stated her mother had also threatened other people with guns.

Solicitation to Commit Kidnapping

On September 3, 2002, Kimberly Oakley, who was contemplating divorce, hired Freeman, who is an attorney, to represent her. When Oakley next spoke with Freeman on September 15, 2002, Freeman seemed different. Contrary to her behavior at their first meeting, Freeman now rambled and failed to respond to Oakley's divorce-related questions. Freeman told Oakley that her daughter had been unjustly removed by CPS, and that she was desperately trying to locate E.'s foster home. Freeman explained that she was concerned for her daughter because of her daughter's undiagnosed schizophrenia. Oakley, who had a daughter with a drug addiction problem in a residential treatment program, was sympathetic. Thereafter, Freeman frequently called Oakley to "unload" about the situation, and Oakley offered to help Freeman.

During one of these conversations in September 2002, Freeman told Oakley that E. and her foster family were attending Calvary Chapel in Escondido, which was the same church Oakley attended. According to Oakley, Freeman repeatedly pressed her to speak to the Calvary Chapel youth pastor to find out information about E.

In early October 2002, Freeman told Oakley that she had "a couple of plans" to "steal" E. from the foster family and stated she always carried large sums of cash with her so she could take E. across the Canadian or Mexican border. Freeman told Oakley that one option she had contemplated was the use

-3-

of an "escort" from a residential drug treatment program to take E.  Oakley explained to Freeman that this service, which was used to remove combative, uncooperative teens from their homes, could not be used to take E. from the foster family, but Freeman did not appear to understand this.

Freeman also repeatedly asked Oakley to "steal" E. from the foster family, stating she had a couple of ideas how to accomplish this.  Freeman suggested a plan where Freeman would wait in the car and Oakley would try to lure E. out of the foster home by telling E. how much Freeman loved her.  Freeman was sure E. would come over and see Freeman in the car, and then Freeman could " 'take off' " with her.  Freeman also proposed that Oakley go to E.'s YMCA after-school program while Freeman waited in the car. Freeman opined that when Oakley told E. how much her mother loved and missed her, E. would agree to walk over to Freeman's car; then Freeman " 'would take [E.] and get her in the car and take off for the Canadian border or the Mexican border.'"  Oakley refused Freeman's requests to carry out these plans.  When Oakley refused, Freeman was angry with Oakley and told her she had another friend who she would ask to take E.

In late October, notwithstanding Oakley's previous refusals, Freeman continued to press Oakley to help her get E. Freeman told Oakley she "'really need[ed]'" Oakley's help and pointed out that it would be easy for Oakley to hide E. at Oakley's rural, gated home.  Oakley continued to refuse her requests, telling Freeman her idea to take E. was "absolutely ludicrous."

October 11 Residential Burglary

Around 2:00 or 3:00 p.m. on October 11, 2002, Freeman called Oakley and told her she had broken into the office of the high school E. was attending and located E.'s foster home address on the school's computer system.  Freeman related that she had been spying on the foster family for "quite some time" and she was upset about the way they were handling E.  Freeman told Oakley she would rent various cars and disguise herself in different outfits; she watched the foster family from the parking lot in their apartment complex; and she followed them when they went places.

At about 8:30 p.m. on October 11, 2002, Freeman again called Oakley.  Freeman was hysterical because E. had not returned to the foster parents' home.  Freeman explained that she was concerned for her daughter's safety because she had been watching the apartment for a good part of the day; E. had not returned home at her typical time; and E. still had not returned home.  Freeman begged Oakley to go with her to watch the apartment.  Freeman stated E. needed medication; no one had diagnosed E. with schizophrenia; no one could handle E. correctly; and E.'s life was being jeopardized.  Oakley felt sorry for Freeman and agreed to accompany her.

Around 9:30 p.m., Freeman picked up Oakley at Oakley's residence.  Freeman drove at a dangerously fast speed to the complex; she was hysterical and screeching that her daughter was in danger and she had to get her daughter away from the foster parents. Freeman told Oakley that she had spent several nights and days in the parking lot watching her daughter and the foster parents, and that she had tried that day to break into the foster parents' apartment.

Freeman and Oakley watched the apartment for about two hours, and it did not appear that anyone was at home.  Oakley told Freeman it was time to leave, and tried to reassure Freeman that her daughter was all right. Freeman

insisted she needed to "'find out what's going on here'" and she had to see if E. was "'okay.'" Freeman left the vehicle and went to a mini-mart where she bought a flashlight and batteries. After Freeman returned to the car and Oakley again tried to persuade her that they should leave and her daughter was fine, Freeman got out of the car and said, "'I don't care. Why should I take this anymore?'" Freeman got the flashlight and a camera and told Oakley she was going inside the foster parents' apartment.

Oakley followed Freeman and tried to dissuade her from entering the apartment. Oakley saw Freeman go over a back wall and enter the apartment through a sliding glass door that had apparently been left open. Oakley saw the camera's flash go off several times and heard drawers being opened and closed. Freeman was in the apartment for about seven or eight minutes. When she returned, Freeman was in a manic-type state. She appeared elated that she had taken pictures; told Oakley that the foster mothers slept together; and stated she had found an address book although she did not have the book with her. Freeman appeared content that she had obtained what she had thought she would get in the apartment, and they left.

On October 12, 2002, Gonzalez noticed that their front door lock had been tampered with, but she did not notice any other disturbance at their apartment. About one month later, Franco and Gonzalez were informed that Freeman may have broken into their apartment.

Stalking: October 19 Incident

Franco and Gonzalez first became aware that someone was following them on October 19, 2002. On this occasion, Franco and Gonzalez drove with E. and their other foster daughter to Los Angeles to visit Franco's grandmother. They first stopped at Franco's mother's home in Oceanside, and then started their trip north at about 9:30 or 10:00 p.m. As Franco was driving on the freeway to her grandmother's house, she noticed a vehicle that seemed to have been following too closely behind her for some time. Franco changed her driving to see if the vehicle would pass them (i.e., slowing down, changing lanes), but the vehicle stayed behind them no matter what she did. Franco tried to lose the vehicle by accelerating to about 75 or 80 miles per hour and changing lanes, but the vehicle continued to follow them. The driver of the vehicle that was following them made several dangerous maneuvers to keep up with Franco, including cutting off vehicles in other lanes and driving within inches of Franco's back bumper. At one point Franco accelerated to 95 miles per hour in her unsuccessful attempts to evade the vehicle.

After the vehicle had been following them for about one-half hour and Franco saw that traffic up ahead was congested, Franco decided to exit the freeway to try to lose the vehicle. The vehicle followed her off the freeway, and at one point its headlights were turned off while it continued to follow them. Franco drove about 40 miles per hour on the surface streets trying to get away from the vehicle, and accidentally ended up on a dark, dead-end residential street with the vehicle still behind her. As Franco turned around in a driveway, the other vehicle stopped across the street with its headlights still turned off. Franco drove back to the freeway at a speed of about 45 to 50 miles per hour, with the vehicle still following her. Once on the freeway, the driver of the pursuing vehicle continued to drive with the lights off. Franco finally managed to lose the vehicle by quickly cutting across traffic lanes and exiting on a left-side off-ramp.

During the incident, Franco was in a "complete panic" and her heart was pounding "a hundred miles a minute." Gonzalez was "[f]rightened to death." The two children were screaming hysterically in the back seat. Because of the speeds she was driving while trying to evade the car, Franco feared for the safety of the occupants of her car and other cars, but explained she was in "survival mode" and could think only of "get[ting] away."

Franco estimated that the entire incident lasted for about one hour. Gonzalez observed that the vehicle following them was a dark grayish-blue Ford Windstar minivan. At one point when the van was beside Franco's car, Gonzalez saw that the driver was light-skinned, heavyset, and appeared to be wearing a disguise, including a wig, dark glasses, and a mustache. During the incident, E. stated the driver was probably her mother who was "trying to get her."

Freeman admitted to Oakley that she had followed the foster parents on a Los Angeles freeway. Freeman told Oakley she had rented a car, dressed up in alternate clothing hoping the foster family would not recognize her, followed the family to a residence in Oceanside, and then chased them into the Los Angeles area. Freeman was "really proud" that she had chased them, and told Oakley she was glad that she "really shook them up" and "really scared them." Freeman stated she stared at them and gave one of the foster mothers a dirty look when she was driving beside her.

October 23 Incident

On October 23, 2002, another incident occurred. Around 10:15 p.m., while Gonzalez was driving with E. from Franco's mother's residence to their home, Gonzalez noticed that a gold Ford Explorer was following them. The vehicle continued to follow Gonzalez as she tried to evade it. Rather than going home, Gonzalez turned on a street, pulled over, and waited 10 minutes. She did not see the Ford Explorer, so she drove to their apartment. As they were walking towards their apartment, E. saw the gold Ford Explorer coming into the parking entrance of the complex. Gonzalez did not think it was safe to go to their apartment, so she and E. returned to their car. The Ford Explorer then turned around to leave the complex. Gonzalez, wanting to know who was following them, followed the Ford Explorer and had E. write down the license plate number, and the estimated year, make, and model of the vehicle. Gonzalez drove up next to the Ford Explorer when traffic slowed because of an accident. The driver tried to cover her face, but E. began crying and screaming, "That's my mother. How could she do this to me?" E. put her seat back so that she could not see Freeman. Gonzalez looked over at Freeman, and Freeman looked at Gonzalez "in this evil manner" as if she wanted to hurt Gonzalez.

Gonzalez did not return home, but drove to Franco's mother's house. When they arrived at Franco's mother's home, Gonzalez was hyperventilating and crying and E. was crying hysterically. At this point, Franco and Gonzalez called the police and CPS. Because of the incident, the next day Gonzalez stayed home from work and E. did not go to school, and E. had an emergency session with her therapist. Franco and Gonzalez changed the locks on their door, put extra locks on the sliding doors and windows, and got a private mail box.

-6-

/ / /

November 3 Incident

On November 3, 2002, between 6:00 and 7:00 p.m., Gonzalez noticed a white Ford Windstar van with tinted windows parked directly across from their apartment. Gonzalez told E. to stay in the apartment. Gonzalez grabbed her phone and stepped outside to see if anyone was in the van. She saw a head moving in the back of the van, but she could not see enough to identify the person. When she returned to her apartment, the van sped off. In spite of the extra security measures at her apartment, Gonzalez still felt frightened.

In early November 2002, during one of Oakley's meetings with Freeman, Oakley saw that Freeman was driving a white minivan. Freeman told Oakley that she had rented the minivan and that it was one of the cars she had been using to spy on the foster family.

Perfume Incidents

On one occasion, Freeman sent E. a filthy jacket that smelled like Tea Rose perfume. On another occasion, after Gonzalez left her car unlocked while picking E. up from school, the car smelled like Tea Rose perfume. E. told Gonzalez that the perfume smelled like her mother's perfume. Gonzalez felt scared, thinking that Freeman would "go to any extent to do something to [Gonzalez]." Freeman told Oakley that she had doused the jacket and sprayed the foster parents' car with her perfume because she wanted her daughter to smell her presence.

Oakley's Reporting of Freeman to CPS on November 10

On November 8, 2002, Freeman called Oakley. Freeman was crying and hysterical and threatening to kill herself. Freeman told Oakley that she had a lot of work to do in E.'s dependency case and that to win her case she had to prove E. was incompetent. Freeman asked Oakley to go with her to the law library to help her sift through the information. Oakley agreed to help Freeman in exchange for a reduction in Freeman's fees.

On November 9, 2002, Oakley accompanied Freeman to the law library. During this meeting, Freeman's mood shifted at different times from elated and happy to sullen and angry. Freeman "threw a ton of papers" from E.'s dependency case in front of Oakley and told her to read them. As Oakley started reading the papers depicting the reasons E. had been removed from Freeman's custody, Oakley realized that Freeman was "a complete con artist, that nothing she had ever told [Oakley] was ever true about her daughter." When Oakley questioned Freeman about the allegations in the dependency reports, Freeman acknowledged that she "vaguely remembered" hitting E. on the hips and slamming E. into a wall; that she was holding a knife during one of the reported incidents; and that she pretended to wipe a piece of toilet paper with feces on it on E.'s hair brush. When Oakley suggested that Freeman admit to some of the allegations and get counseling, Freeman became angry, stating that she could lose her law license and that she had to prove E. was incompetent.

On November 10, 2002, Oakley called CPS to advise E.'s social worker that she was concerned for E.'s safety. On November 14, 2002, E. was removed from Franco and Gonzalez's foster home.

1

2        On December 6, 2002, the police searched Freeman's residence and car.
The police developed rolls of film found in Freeman's residence, and showed
3   the photographs to Gonzalez and Franco.  The photographs depict Gonzalez,
the open front door of Franco's and Gonzalez's residence, their other foster
4   daughter, Franco's place of employment and car, and Franco's mother's
residence and car.

5

6   Foster Parents' Reactions to the Stalking

7        Because of the stalking incidents, Gonzalez and Franco felt their life
was completely changed.  They felt fearful and constantly on guard. Gonzalez
had trouble sleeping and had nightmares. Franco felt vulnerable, helpless, and
8   "completely violated."  She was also concerned for the safety of her mother
and other family members.  During the time when they did not know who was
9   following them, Franco was frightened because she had no idea what the
person's intentions were. Once the stalker was identified as Freeman, Franco
10   was frightened because she did not know what Freeman was capable of,
particularly given E.'s accounts of her mother's previous violent behavior.

11

12   Jury Verdict and Sentence

13        The jury convicted Freeman of two counts of stalking (one count per
foster parent); residential burglary; solicitation to commit kidnapping; and
14   misdemeanor child endangerment and battery of E.  She received a six-year
sentence.

15   (Resp't Lodgment No. 13 at 4-16.)

16   **III.   PROCEDURAL BACKGROUND**

17        On September 12, 2003, Freeman was charged in an information with seven counts:

18   two counts of stalking (Cal. Penal Code § 646.9(a) (counts 1 and 2); residential burglary of

19   an inhabited dwelling (Cal. Penal Code §§ 459, 490) (count 3); solicitation of kidnaping (Cal.

20   Penal Code §§ 207(a), 653f(a) (count 4); two counts of misdemeanor child endangerment

21   (Cal. Penal Code § 273a(b)) (counts 5 and 6); and misdemeanor battery (Cal. Penal Code §

22   242) (count 7).[1]  (Resp't Lodgment No. 1 at 1-3.)  On November 4, 2004, a jury convicted

23   Freeman on all counts.  (Resp't Lodgment No. 1 at 209-215.)  On April 27, 2005, the trial

24   court sentenced Freeman to 6 years in prison.  (Resp't Lodgment No. 1 at 512; Lodgment

25   No. 2 at 3123-24.)

26        Freeman appealed her conviction to the California Court of Appeal, Fourth Appellate

27   District, Division One.  In her appeal, she argued (1) the trial judge should have been

28   _____

[1]   Freeman was originally arraigned on December 10, 2002.  (Rept's Lodgment No. 1 at 524.)

disqualified for bias; (2) the solicitation charge was barred because the crime was preempted by a child abduction statute, (3) the trial court erred in denying her motion for acquittal; (4) the court erred in failing to properly instruct the jury as to the stalking and kidnaping charges; (5) the trial court erred in permitting hearsay evidence of a victim's 911 telephone call.  (Resp't Lodgment Nos. 3A, 3B, 3C, 3D.)

On February 5, 2007, the California Court of Appeal reversed Freeman's conviction and remanded the case for retrial, holding that the trial court was constitutionally barred from presiding over Freeman's case because there was an appearance of judicial bias.  (Resp't Lodgment No. 6.)   In an effort to provide guidance to the trial court on retrial, the appellate court rejected Freeman's remaining claims.  (*Id.*)

The State filed a Petition for Review in the California Supreme Court, asking the court to review the appellate court's decision on the judicial bias issue.  (Resp't Lodgment No. 7A.)  Freeman also filed a Petition for Review, requesting the court reverse the Court of Appeal's decisions on the other issues.  (Resp't Lodgment No. 7B .)

On May 23, 2007, the California Supreme Court granted the State's petition and vacated the Court of Appeal's decision.  The Supreme Court denied Freeman's Petition for Review.  (Resp't Lodgment No. 8.)  On January 21, 2010, the court issued its opinion and reversed the appellate court.  The court concluded that Freeman's due process rights were not violated by judicial bias (or the appearance thereof).  (Resp't Lodgment No. 12 at 8-17.)  It remanded the case to the appellate court for further consideration in light of its opinion.  (*Id.* at 18.)

On April 12, 2010, the Court of Appeal issued its opinion rejecting Freeman's remaining claims and affirmed the judgement in full.  (Resp't Lodgment No. 13.)  Freeman filed a Petition for Review in the California Supreme Court.  (Resp't Lodgment No. 14.)  The California Supreme Court denied review on August 11, 2010.  (Resp't Lodgment No 15.)

On September 23, 2010, Freeman filed a Petition for writ of habeas corpus in this Court.  (ECF No. 1.)  Respondent filed an Answer on March 14, 2011.  (ECF No. 14.)  On August 9, 2011, Petitioner filed a Traverse.  (ECF No. 29.)

1    / / /

2

3        **IV.    <u>SCOPE OF REVIEW</u>**

4        Title 28, United States Code, § 2254(d), sets forth the following scope of review for

5    federal habeas corpus claims:

6            d) An application for a writ of habeas corpus on behalf of a person in
         custody pursuant to the judgment of a State court shall not be granted with
7        respect to any claim that was adjudicated on the merits in State court
         proceedings unless the adjudication of the claim—
8
             (1) resulted in a decision that was contrary to, or involved an
9        unreasonable application of, clearly established Federal law, as determined by
         the Supreme Court of the United States; or
10
             (2) resulted in a decision that was based on an unreasonable
11       determination of the facts in light of the evidence presented in the State court
         proceeding.
12

13   28 U.S.C.A. § 2254(d)(1)-(2) (West 2006).

14       To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or

15   § 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court

16   interprets § 2254(d)(1) as follows:

17           Under the "contrary to" clause, a federal habeas court may grant the writ if the
         state court arrives at a conclusion opposite to that reached by this Court on a
18       question of law or if the state court decides a case differently than this Court
         has on a set of materially indistinguishable facts.  Under the "unreasonable
19       application" clause, a federal habeas court may grant the writ if the state court
         identifies the correct governing legal principle from this Court's decisions but
20       unreasonably applies that principle to the facts of the prisoner's case.

21   *Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

22       Where there is no reasoned decision from the state's highest court, the Court "looks

23   through" to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797,

24   801-06 (1991).  If the dispositive state court order does not "furnish a basis for its

25   reasoning," federal habeas courts must conduct an independent review of the record to

26   determine whether the state court's decision is contrary to, or an unreasonable application of,

27   clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.

28   2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *Himes v. Thompson*, 336

1  F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent

2  when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as

3  neither the reasoning nor the result of the state-court decision contradicts [Supreme Court

4  precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal

5  law.

6  **V.    DISCUSSION**

7      In her Petition, Freeman claims (1) the trial judge was biased against her in violation

8  of her right to due process and California state law, (2)  there was insufficient evidence to

9  support her convictions, in violation of her due process rights, (3) the prosecutor committed

10  misconduct, in violation of her due process rights (4) the trial court improperly denied her

11  request to substitute retained counsel and her subsequent *Marsden* motion, in violation of her

12  right to counsel (5) trial counsel was ineffective, in violation of her Sixth Amendment rights,

13  (6) appellate counsel was ineffective, in violation of her Sixth Amendment rights, and (7) she

14  is actually innocent.[2]  (*See generally*, Pet.)  In her Traverse, Freeman requests an evidentiary

15  hearing to develop her ineffective assistance of counsel claims.  (*See* Traverse at 1-2.)

16      **A.    Judicial Bias**

17      Freeman contends the judge who presided over her case was biased and his refusal to

18  recuse himself rendered her trial fundamentally unfair, in violation of her due process rights

19  and California state law.  (*See* Pet. at 40-88.)  She also argues that Judge O'Neill was

20  prohibited under California Code of Civil Procedure section 170.2 from accepting

21  reassignment of her case.  She claims further, that the California Supreme Court misapplied

22  section 170.3(d) and violated her federal due process rights, when it ruled that she forfeited

23  her statutory claims by failing to file a writ seeking review, as required by section 170.3(d).

24  (Pet. at 100-121.)  Respondent argues that to the extent Freeman's claims  rest on state law,

25  they are not cognizable under 28 U.S.C. § 2254 and are also procedurally defaulted.

26

27

28      [2] Some of the claims raised in the Petition overlap and others contain several distinct grounds for relief.  For instance, Ground One of the Petition includes claims of judicial bias and several allegations of ineffective assistance of trial and appellate counsel.  As such, the Court has separated individual claims and grouped similar claims together.

1  Respondent contends the California Supreme Court's denial of Freeman's federal due

2  process claim was neither contrary to, nor an unreasonable application of, clearly established

3  law.  (Answer at 18-24.)

### 1.    Failure to State a Cognizable Claim

5          Respondent argues that Freeman's claims related to application of California Code of

6  Civil Procedure section 170 *et seq.* are not cognizable on federal habeas review.  (Answer at

7  21.)  To present a federal habeas corpus claim under § 2254, a state prisoner must allege both

8  that she is in custody pursuant to a "judgment of a State court" and that she is in custody in

9  "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

10 "In conducting habeas review, a federal court is limited to deciding whether a conviction

11 violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502

12 U.S. 62, 68 (1991).  A state's interpretation of its laws or rules provides no basis for federal

13 habeas corpus relief because no federal constitutional question arises.  *Id.*

14         Freeman argues in her Traverse that California Code of Civil Procedure section

15 107.2(d) and other statutes related to the disqualification of judges are "intertwined with the

16 federal due process clause."  (*Id.* at 27.)  California's judicial disqualification statutes,

17 however, provide more protection than due process requires.  *See People v. Cowan*, 113 Cal.

18 Rptr. 3d 850 (2010); *see also Miller v. Terhune*, 49 Fed. Appx. 148, 149-50 (9th Cir. 2002)

19 (stating that "while [the judge] should have recused himself under California law, *see* Cal.

20 Civ.Proc. Code §170.1(a). . .this alone does not establish a deprivation of [Petitioner's] due

21 process right to a trial by an impartial judge").  Indeed, the Supreme Court has stated that

22 "most matters relating to judicial disqualification [do] not rise to a constitutional level."

23 *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986).

24         Thus, to the extent Freeman claims are related solely to alleged errors of California

25 law, they are not cognizable on habeas review.  *See Bracy v. Gramley*, 520 U.S. 899, 904

26 (1997).[3]  Specifically, her claim that the judge was prohibited from accepting reassignment of

27 _____

28         [3]  Having concluded that Petitioner's state law claims are not cognizable, the Court need not
address Respondent's argument that those same claims are procedurally defaulted.  *See Lambrix v.
Singletary*, 520 U.S. 518, 525 (1997) (noting that, in the interest of judicial economy, courts may resolve

-12-

her case and her assertion that the California Supreme Court erred when it found her statutory claims were forfeited under section 170.3(d),[4] provide no basis for federal habeas corpus relief.

### 2. Due Process Claim

Freeman claims that Judge O'Neill was biased against her and therefore her trial was fundamentally unfair, in violation of her due process rights. She raised this claim before the California Supreme Court, and it was denied in a reasoned decision. (*See* Lodgment No. 12.) Respondent argues the denial was neither contrary to, nor an unreasonable application of, clearly established law. (Answer at 18-24.)

a.        State Court Decision

The California Supreme Court summarized the facts (to which this Court must defer under §2254(e)(1)) and analyzed Freeman's constitutional claim as follows:

> On the morning of December 19, 2002, defendant, then in custody, appeared before Judge Robert O'Neill for a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44, in which she sought to replace her court-appointed counsel. After the court granted her motion, the issue of bail arose. Judge O'Neill said he would set the matter for bail review before another judge. After some further colloquy, defendant said, "I was wanting to bring up at that hearing the possibility of house arrest there is [sic] rumors that are not really charges that I have been stalking poor Judge Elias." (Judge Elias was the judge presiding over the dependency court proceeding involving defendant and her daughter.)

> Judge O'Neill replied that he was aware of the "allegation," and commented, "Judge Elias and I worked together in the District Attorney's office. I have known Judge Elias for 23 years. He is a friend of mine, and that is another reason I want to set the bail review back in front of Judge Szumowski who originally set bail. [¶] There is no good cause to change bail, and I really think based on what I have been told I would recuse myself from the bail issue."

> After further discussion on scheduling matters, defendant again raised

---

easier matters where complicated procedural default issues exist); *see also Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).

[4]   Under California law, a determination regarding disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal. . .filed within 10 days of the order determining the question of disqualification. Cal. Civil Code § 107.3(d). The California Supreme Court concluded Freeman's "failure to seek writ review of that denial forfeit[ed] both of her potential statutory claims: that Judge O'Neill should have been disqualified for cause and that, having once recused himself, he was statutorily precluded from accepting reassignment of the case." (Resp't Lodgment No. 12 at 6-7.)

the bail issue, telling the court she had been advised at arraignment to seek bail review before someone other than Judge Szumowski. Judge O'Neill told her she should discuss the situation with her newly appointed counsel "in light of the allegations made – just made concerning Judge Elias. In that situation a judge who is not a member of the bench should hear a bail review. That would be a retired judge or a judge sitting on assignment." Defendant observed that Judge Elias had not recused himself because "he made it clear he doesn't think there is any substance to those allegations," and said, "Do you think in lieu of all this craziness if – that just house arrest would be a good idea?" The court replied, in part, "What I am doing as to your bail motion, I am recusing myself. I don't think I'm the person that should hear it."

Between January 6, 2003, and September 3, 2003, various judges of the San Diego Superior Court – excluding Judge O'Neill – presided over hearings in defendant's case related to appointment of counsel, bail review, discovery, and other matters. On September 3, 2003, defendant's case was assigned to retired Judge Charles Jones for all purposes. Judge Jones presided over defendant's preliminary hearing and bound her over for trial.

At a May 14, 2004 status conference, Judge Jones stated on the record that there was a discussion in chambers about why the matter had been assigned to him. "And the district attorney has advised me of how and why that came about and the reason. The reason no longer exists, and it does not look like there's been a recusal of the San Diego County Superior Court, so I will put another couple of other matters on the record and transfer the matter back to [Judge Deddeh]."

Later that day, Judge Deddeh explained, "With regard to the recusal issue, it is my understanding that it was communicated to Judge Jones that the only reason the bench was being recused is because there is a possibility that on . . . [defendant's] computer . . . there was some indication that she was stalking Judge Elias. Apparently the computer has been reviewed. . . . And . . . apparently [Judge Elias is] not a victim in this case. And so there is apparently no reason for the bench to recuse itself." Ultimately, Judge Deddeh reassigned the case to Judge O'Neill. Defendant reminded the court that "he already recused himself. He recused himself because he is a good friend of Judge Elias." Judge Deddeh replied, "He can do that when I send it up there." Defendant said, "Okay." Judge Deddeh added, "We'll see whether or not this is going to be an issue for him." When the case reached Judge O'Neill that day, defendant filed a handwritten challenge to him in which her counsel did not join. No action was taken on the challenge on that day.

The May 20, 2004 minute order for Judge O'Neill's department states that the matter was sent back to Judge Deddeh for reassignment that morning but does not reflect what discussion led to this action. Judge Deddeh declined to consider the disqualification motion on the ground that it was not filed by defendant's counsel and returned the case to Judge O'Neill. In Judge O'Neill's court, defendant evidently withdrew her challenge. Judge O'Neill returned the matter to Judge Deddeh "for a record to be made re: withdrawal of challenge and assignment back to [Judge O'Neill]." Back in Judge Deddeh's court, Judge Deddeh asked defense counsel, "All right. So with regard to the [Code of Civil Procedure section] 170.1 challenge . . . is your client withdrawing her 170.1 challenge?" Defense counsel answered, "Yes, Your Honor." The court then posed the same question to defendant: "All right. So then is that right, Miss Freeman, you are withdrawing that?" Defendant replied, "Yes, Your Honor." Judge Deddeh then reassigned the case to Judge O'Neill.

-14-

On October 18, 2004, the day of trial, during a hearing on another *Marsden* motion, defendant again sought to disqualify Judge O'Neill for cause. Defendant claimed she had been "bullied" by her attorneys into keeping Judge O'Neill but that she believed that he "was personally prejudiced; and I always have because you told me that in December of 2002." The court responded, "Ms. Freeman, you withdrew your challenge in front of Judge Deddeh." After the court denied her *Marsden* motion, defendant again claimed the court was "prejudiced" against her and said, "I don't believe that once you recused yourself for cause that there was any possible way for that to be overridden." The court responded, "Ms. Freeman, that has been ruled upon."

The matter proceeded to trial and defendant was convicted and sentenced as noted.

. . . .

We now turn to the issue on which review was granted: does the due process clause require judicial disqualification based on the mere appearance of bias. "A fair trial in a fair tribunal is a basic requirement of due process." (*In re Murchison* (1955) 349 U.S. 133, 136, 75 S. Ct. 623, 99 L.Ed. 942.) "The Supreme Court has long established that the Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge." (*Larson v. Palmateer* (9th Cir.2008) 515 F.3d 1057, 1067.) The operation of the due process clause in the realm of judicial impartiality, then, is primarily to protect the individual's right to a fair trial. In contrast to this elemental goal, a statutory disqualification scheme, like that found in our Code of Civil Procedure, is not solely concerned with the rights of the parties before the court but is also "intended to ensure public confidence in the judiciary." (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1070, 103 Cal.Rptr.2d 751, 16 P.3d 166.) Thus, an explicit ground for judicial disqualification in California's statutory scheme is a public perception of partiality, that is, the appearance of bias. (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii); *Christie v. City of El Centro* (2006) 135 Cal.App.4th 767, 776, 37 Cal. Rptr. 3d 718 ["Disqualification is mandated if a reasonable person would entertain doubts concerning the judge's impartiality"].)

By contrast, the United State Supreme Court's due process case law focuses on actual bias. This does not mean that actual bias must be proven to establish a due process violation. Rather, consistent with its concern that due process guarantees an impartial adjudicator, the court has focused on those circumstances where, even if actual bias is not demonstrated, the probability of bias on the part of a judge is so great as to become "'constitutionally intolerable.'" (*Caperton v. A.T. Massey Coal Co., Inc., supra,*– U.S. at p.–, 129 S.Ct. at p. 2262 (*Caperton*)). The standard is an objective one.

*Caperton* both reviewed the court's jurisprudence in this area and extended it. The issue in *Caperton* was whether due process was violated by a West Virginia high court justice's refusal to recuse himself from a case involving a $50 million damage award against a coal company whose chairman had contributed $3 million to the justice's election campaign. The justice cast the deciding vote that overturned the award. The United States Supreme Court held that, under the "extreme facts" of the case, "the probability of actual bias rises to an unconstitutional level." (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2265.)

-15-

As the *Caperton* court noted, in the high court's first foray into this area in *Tumey v. Ohio* (1927) 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, it had "concluded that the Due Process Clause incorporated the common-law rule that a judge must recuse himself when he has 'a direct, personal, substantial, pecuniary interest' in a case." (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2259.) *Caperton* observed, however, that "new problems have emerged that were not discussed at common law" leading it to identify "additional instances which, as an objective matter, require recusal." (*Ibid.*) *Tumey* itself was such a case. *Tumey* involved a mayor-judge authorized to conduct court trials of those accused of violating a state alcoholic beverage prohibition law; if a defendant was found guilty, a percentage of his fine was paid to the mayor and the rest was paid to the village's general treasury. The court held that the system violated the defendant's due process rights even assuming that the mayor-judge's direct pecuniary interest would not have influenced his decision. "The [*Tumey*] Court articulated the controlling principle: [¶] 'Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.'" (*Caperton*, at p. –, 129 S.Ct. at p. 2260.)

The *Caperton* court observed that, even in that early case, the high court was "concerned with more than the traditional common-law prohibition on direct pecuniary interest. It was also concerned with a more general concept of interests that tempt adjudicators to disregard neutrality." (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2260.) The court in *Caperton* reviewed two of its other decisions implicating indirect pecuniary interests that in its view tested the neutrality of the adjudicators in those cases. *Ward v. Monroeville* (1972) 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 involved another mayor-judge, but in that case the mayor's compensation was not tied to his adjudications. Rather, "the fines the mayor assessed went to the town's general fisc." (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2260.) Nonetheless, the *Monroeville* court found the procedure to violate due process because of the "'"possible temptation"'" the mayor might face to maximize the town's revenues at the expense of defendants appearing before him. (*Caperton*, at p. –, 129 S.Ct. at p. 2260.)

Finally, in *Aetna Life Insurance Co. v. Lavoie* (1986) 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823, the court "further clarified the reach of the Due Process Clause regarding a judge's financial interest in a case. There, a justice had cast the deciding vote on the Alabama Supreme Court to uphold a punitive damages award against an insurance company for bad-faith refusal to pay a claim. At the time of his vote, the justice was the lead plaintiff in a nearly identical suit pending in Alabama's lower courts. His deciding vote, this Court surmised, 'undoubtedly "raised the stakes"' for the insurance defendant in the justice's suit. [Citation.] [¶] The Court stressed that it was 'not required to decide whether in fact [the justice] was influenced.' [Citation.] The proper constitutional inquiry is 'whether sitting on the case then before the Supreme Court of Alabama "'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.'"' [Citation.] The Court underscored that 'what degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision."' [Citation.] In the Court's view, however, it was important that this test have an objective component." (*Caperton, supra*, 556 U.S. at pp. – , 129 S.Ct. at pp. 2260-2261.)

The *Caperton* court then examined another line of cases in which the

-16-

court had found that the probability of actual bias was so high as to require recusal under the due process clause.  "The second instance requiring recusal that was not discussed at common law emerged in the criminal contempt context, where a judge had no pecuniary interest in the case but was challenged because of a conflict arising from his participation in an earlier proceeding." (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2261.)  That case, *In re Murchison, supra*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942, involved a judge who presided over the contempt trial of two witnesses whom the same judge had charged with contempt following his examination of them at a proceeding to determine whether to file criminal charges; a so-called ""one-man grand jury."""  (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2261, quoting In re *Murchison, supra*, 349 U.S. at p. 133, 75 S.Ct. 623.)

As *Caperton* explained, the *Murchison* court set aside the contempt convictions "on grounds that the judge had a conflict of interest at the trial stage because of his earlier participation followed by his decision to charge them. . . . The [*Murchison*] Court recited the general rule that 'no man can be a judge in his own case,' adding that 'no man is permitted to try cases where he has an interest in the outcome.' [Citation.]  [*Murchison*] noted that the disqualifying criteria 'cannot be defined with precision.  Circumstances and relationships must be considered.' [Citation.]  These circumstances and the prior relationship required recusal:  'Having been part of [the one-man grand jury] process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused.' [Citation.]" (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2261.)

The *Caperton* court then turned to another decision in this line of cases – *Mayberry v. Pennsylvania* (1971) 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 53 – which held that "'by reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor.' " (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2262, *quoting Mayberry v. Pennsylvania, supra*, 400 U.S. at p. 466, 91 S.Ct. 499.)  In so holding, however, the *Mayberry* court had "considered the specific circumstances presented" and was not propounding a general rule that "'every attack on a judge . . . disqualifies him from sitting.'" (*Caperton*, 556 U.S. at p. –, 129 S.Ct. at p. 2262; *see Ungar v. Sarafite* (1964) 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921.)  Rather, "[t]he inquiry is an objective one.  The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2262.)

The *Caperton* court then applied the principles derived from these cases to the issue before it – the impact of campaign contributions on judicial impartiality – acknowledging that its prior cases had not addressed this circumstance.  Noting that the West Virginia justice's rejection of the petitioners' disqualification motion was based on his conclusion that he harbored no actual bias, the court said:  "We do not question his subjective findings of impartiality and propriety.  Nor do we determine whether there was actual bias."  (*Caperton, supra*, 556 U.S. at p. —, 129 S.Ct. at p. 2263.)  Rather, the court suggested, the inherent subjectivity involved in an individual judge's examination of his or her own bias "simply underscore[s] the need for objective rules. . . . In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. [Citations.]  In defining these standards the Court

-17-

has asked whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.' [Citation.]" (*Ibid*.)

Emphasizing that the case before it was "exceptional," the court concluded that "there is a serious risk of actual bias – based on objective and reasonable perceptions – when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at pp. 2263–2264.)  In so concluding, the court focused on the relative size of the contribution in relation to the total amount spent on the campaign – it was larger than the amount spent by all other contributors and 300 percent greater than that spent by the campaign committee – and the "temporal relationship between the campaign contributions, the justice's election, and the pendency of the case. . . . It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice." (*Id*. at p. —, 129 S.Ct. at pp. 2264–2265.)  The court concluded:  "On these extreme facts the probability of actual bias rises to an unconstitutional level." (*Id*. at p. —, 129 S.Ct. at p. 2265.)

In deflecting the assertion by the respondent coal company that its ruling would open a floodgate of due-process-based recusal motions, the *Caperton* court again emphasized the exceptional nature of the cases in which it had been compelled to conclude that the due process clause had been violated by a judge's failure to recuse himself.  "In each case the Court dealt with extreme facts that created an unconstitutional probability of bias that '"cannot be defined with precision."'  [Citation.]   Yet the Court articulated an objective standard to protect the parties' basic right to a fair trial in a fair tribunal.  The Court was careful to distinguish the extreme facts of the cases before it from those interests that would not rise to a constitutional level. [Citations.]" (*Caperton, supra*, 556 U.S. at p. —, 129 S.Ct. at pp. 2265-2266.)  As the court also observed, the states have moved to adopt judicial conduct codes to eliminate "even the appearance of partiality" (*id*. at p. —, 129 S.Ct. at p. 2266), and these codes comprise " 'standards more rigorous than due process requires.'" (*Id*. at p. —, 129 S.Ct. at p. 2267.)  The court, reiterating that the due process clause provides the "'constitutional floor'" in matters involving judicial disqualification concluded:  "Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution.  Application of the constitutional standard implicated in this case will thus be confined to rare instances."  (*Ibid*.)

The rule of judicial disqualification limned in *Caperton* may be complex but its application is limited.  According to the high court, the protection afforded a litigant under the due process clause in the realm of judicial disqualification extends beyond the narrow common law concern of a direct, personal, and substantial pecuniary interest in a case to "a more general concept of interests that tempt adjudicators to disregard neutrality." (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2260.)  Where such interests are present, a showing of actual bias is not required.  "The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'"  (*Id*., at p. —, 129 S.Ct. at p. 2262.)  Moreover, the court has said that "'what degree or kind of interest is sufficient to disqualify a judge from sitting

-18-

"cannot be defined with precision."'" (*Id.*, at p. –, 129 S.Ct. at p. 2261.) Nonetheless, the court has also made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found. (*Id.* at p. – 129 S.Ct. at p. 2267.) Less extreme cases – including those that involve the mere appearance, but not the probability, of bias – should be resolved under more expansive disqualification statutes and codes of judicial conduct. (*Ibid.*)

In supplemental briefing regarding the impact of *Caperton* on this case, defendant argues that the facts here may present the kind of extreme case that implicates the due process clause. Defendant cites the Court of Appeal's analysis in which it concluded that Judge O'Neill's friendship with Judge Elias, and the similarity between the stalking charges against defendant and the allegation that she had stalked Judge Elias, were "consistent with what one would typically associate with actual bias." She also maintains that Judge O'Neill's acceptance of reassignment of her case after he had once recused himself constitutes unprecedented and extreme circumstances that may present a due process violation. At minimum, she requests that her case be remanded to the Court of Appeal for a determination of whether the probability of actual bias on Judge O'Neill's part was constitutionally intolerable.

We reject defendant's arguments. This case does not implicate any of the concerns – pecuniary interest, enmeshment in contempt proceedings, or the amount and timing of campaign contributions – which were the factual bases for the United States Supreme Court's decisions in which it found that due process required judicial disqualification. While it is true that dicta in these decisions may foreshadow other, as yet unknown, circumstances that might amount to a due process violation, that dicta is bounded by repeated admonitions that finding such a violation in this sphere is extraordinary; the clause operates only as a "fail-safe" and only in the context of extreme facts.

In this case, defendant had a statutory remedy to challenge Judge O'Neill's refusal to disqualify himself and failed to pursue it. Having forfeited that remedy, she cannot simply fall back on the narrower due process protection without making the heightened showing of a probability, rather than the mere appearance, of actual bias to prevail. We also reject defendant's claim that Judge O'Neill's acceptance of her case after he had once recused himself presents the kind of exceptional facts that demonstrate a due process violation. At most, Judge O'Neill's decision to accept reassignment of defendant's case may have violated the judicial disqualification statutes that limit the action that may be taken by a disqualified judge. (*See, e.g., In re Marriage of Kelso* (1998) 67 Cal.App.4th 374, 383, 79 Cal.Rptr.2d 39; *Geldermann v. Bruner, supra*, 229 Cal.App.3d at p. 665, 280 Cal.Rptr. 264.) But, without more, this does not constitute the kind of showing that would justify a finding that defendant's due process rights were violated.

In short, the circumstances of this case, as we view them, simply do not rise to a due process violation under the standard set forth by *Caperton* because, objectively considered, they do not pose "'such a risk of actual bias or prejudgment.'" (*Caperton, supra*, 556 U.S. at p. –, 129 S.Ct. at p. 2263) as to require disqualification.

(Resp't Lodgment No. 12 at 8-17; *see also People v. Freeman*, 47 Cal. 4th 993, 1000-06 (2010).)

-19-

b.      Discussion

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial tribunal. *In re Murchison*, 349 U.S. 133, 136 (1955). To succeed on a judicial bias claim, however, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). A petitioner may show judicial bias in one of two ways, by demonstrating the judge's actual bias or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity. *See Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir.1994).

"While most claims of judicial bias are resolved by common law, statute, or the professional standards of the bench and bar, the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor" and requires judicial recusal in cases "where the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Hurles v. Ryan*, 650 F.3d 1301, 1309 (9th Cir. 2011) (citing *Caperton v. A.T. Massey Coal Co. Inc.* 556 U.S. 868, 872 (2009)). On habeas corpus review, the relevant inquiry is not whether the trial judge committed judicial misconduct, but rather, "whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995).

As the state court discussed, in *Caperton*, the U.S. Supreme Court held that a judge should have recused himself from hearing an appeal in which one of the parties had contributed over three million dollars to the judge's campaign – more than all of his other campaign contributors combined. *Caperton*, 556 U.S. at 873. The Court concluded that the judge's "significant and disproportionate influence – coupled with the temporal relationship between the election and the pending case" created an unconstitutional probability of actual bias. *Id.* at 886-87. The Court, however, cautioned that this was an "extraordinary situation." *Id.* at 887.

In *Caperton*, the Court noted that its previous recusal cases also dealt with "extreme facts that created an unconstitutional probability of bias" and in those cases the Court was

-20-

1   "careful to distinguish the extreme facts of the cases before it from those interests that would

2   not rise to a constitutional level." *Id.* at 887-88 (citing *Aetna Life Insurance Co. v. Lavoie*,

3   475 U.S. 813, 825-26 (1986); *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971); *In re*

4   *Murchison*, 349 U.S. 133, 137 (1955))

5        The state court's conclusion that Freeman's was not the kind of "extreme case" that

6   implicates due process was a reasonable application of Supreme Court law.  As discussed

7   above, in *Caperton*, extraordinary sums of money were contributed to the judge's election

8   campaign by a party in a lawsuit that was heard soon after the judge's election, creating a

9   "probability of actual bias." *Caperton*, 129 S.Ct. at 2263-64.  Here, Freeman contends only

10  that Judge O'Neill was biased because he initially recused himself (nearly two years before

11  trial) based on rumors that she had stalked a fellow judge.  When the rumors proved untrue,

12  Judge O'Neill accepted reassignment to her case. There is nothing to suggest the appearance

13  of a possible *quid pro quo* that was the concern in *Caperton*.  These are not the kind of

14  exceptional facts which give rise to a due process violation. *See id.* at 884.

15       Freeman's case is not analagous to the other unique cases discussed by the Supreme

16  Court.  She does not allege Judge O'Neill had "direct, personal, substantial, and pecuniary"

17  in her case as was found in *Lavoie*, 475 U.S. at 824.  Nor has she shown the judge acted as

18  part of the accusatory process, or was "acting as a judge in his own case," as was the case in

19  *Murchinson*, where the judge had acted as a "one-man grand jury" to bring contempt charges

20  against the petitioners, and then tried, convicted and sentenced them. *Muchinson*, 349 U.S.

21  at 136.  Finally, Petitioner has not alleged that Judge O'Neill became "embroiled" in the type

22  of "running, bitter controversy" with Freeman that the Court found in *Mayberry*.  In that

23  case, Court held that a defendant's persistent insulting personal attacks against the trial judge

24  demonstrated a potential for bias against the defendant and that compelled that a different

25  judge preside over a contempt hearing based on the alleged improper conduct. *Mayberry*,

26  400 U.S. at 466.  Freeman's case does not deal with contempt proceedings or the "unique"

27  circumstances discussed by the Supreme Court in its judicial bias cases.

28       The Ninth Circuit's decision in *Hurles* provides yet another example of the type of

-21-

extreme facts which must be shown to support a due process violation.  In that case, when the prosecutor decided to seek the death penalty and Hurles's attorney made an ex parte request for appointment of co-counsel.  Judge Hilliard denied the request, Hurles's attorney petitioned the appellate court in a special action.  Judge Hilliard appeared and filed a responsive pleading defending her ruling in which she commented that the overwhelming evidence of Hurles's guilt made the case "very simple and straightforward."  *Id.* at 1306.  In her brief, the judge also made comments which appeared to "question the competency of [defense counsel] who determined she needed assistance in a capital case."  *Id.* at 1320.  The appellate court denied Judge Hilliard standing and "found her conduct improper because it threatened a 'principle . . .essential to impartial adjudication,' that judges have 'no personal stake – surely no *justiciable* stake – in whether they are ultimately affirmed or reversed."  *Id.* at 1316 (emphasis in original).

The Ninth Circuit court ruled that a trial judge's role in defending her own ruling on appeal in a higher court (by filing a brief through counsel in the appellate court) rendered her unconstitutionally biased.  *Id.*  Due process required recusal, the court held, because the judge "held two incompatible roles: that of arbiter and that of adversary."  *Id.* at 1314.

*Hurles* is readily distinguishable from Freeman's case.  As the Ninth Circuit emphasized, *Hurles* was "highly unusual," with "exceptional facts."   *Id.* at 1304.  There, the trial judge "became involved as a party in an interlocutory appeal, was denied standing to appear as an adversary, and then proceeded to preside over a murder trial and single-handedly determine Hurles' death sentence."   *Id.*  Moreover, during the course of defending her ruling, the judge made comments which challenged the professionalism and competency of Hurles' only attorney and which "indicate[d] a prejudgment of the case against Hurles months before she would preside over his trial and, later, unilaterally sentence him to death and adjudicate his post-conviction claims for relief."   *Id.* at 1319.  The Ninth Circuit concluded that the statements about the case and defense counsel, combined with the judge's improper participation in a special action to defend her own ruling against defendant raised an unconstitutional potential for bias.  *Id.* at 1314.  The court emphasized that the case

1  dealt with a "perfect storm of rare incidents that are unlikely to repeat themselves." *Id.* at

2  1322.

3  There is no such "perfect storm" in this case. Judge O'Neill did not become involved

4  in the adversarial process. He stepped aside when rumors surfaced that Freeman had stalked

5  Judge Elias, a fellow judge and friend. The District Attorney's office apparently investigated

6  and determined the rumors to be unfounded. Judge O'Neill had nothing to do with that

7  investigation and made no remarks suggesting any opinion about the validity of the rumors.

8  Freeman appears to claims that Judge O'Neill's showed actual bias by denying her

9  motion for acquittal, raising her bail, preventing her from presenting witnesses in her

10  defense, "strik[ing] almost everything favorable to Petitioner's defense from the record,"

11  allowing improper evidence and argument favorable to the prosecution, and interrupting and

12  criticizing her in front of the jury. (*See* Pet. at 54-56.) None of these claims amount to a

13  showing of actual bias.

14  First, "judicial rulings alone almost never constitute [a] valid basis for a bias or

15  partiality motion." *See Liteky v. United States*, 510 U.S. 540, 555 (1994). In this case, Judge

16  O'Neill's rulings were not improper. As discussed in section V(B) of this Report and

17  Recommendation, there was sufficient evidence to support her convictions. In addition,

18  Judge O'Neill ordered Freeman's bail raised only after evidence was presented that she had

19  been in a physical altercation with E. and was found in violation of a "no contact" order.

20  *See* Resp't Lodgment No. 2 at 716-18; Resp't Lodgment No. 1 at 574-57.) Contrary

21  Therefore, O'Neill's rulings on those matters do not suggest bias on his part.

22  Second, while it is true that Judge O'Neill interrupted her testimony at times , he did

23  so in an attempt to maintain order. "A judge's ordinary efforts at courtroom administration –

24  even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain

25  immune [from charges of bias]." *See Liteky*, 510 U.S. at 555-56 (1994). Although Freeman

26  does not point to any specific comments by the judge, the Court offers a few examples from

27  the record:

28  At one point, after sustaining series of objections from the prosecutor that Freeman

1    was giving narrative unresponsive answers, the judge stated:

2         Don't volunteer information, just try to answer the question, because
         otherwise the People have an objection and you're not going to get your story
3         across.  So try to listen to the question from Mr. Apgar, count to five, formulate
         your answer, answer the question.  Mr. Apgar knows where he wants to go and
4         what information that you and he wish to convey to the jury.  So try that, okay?

5    (Resp't Lodgment No. 2 at 2510-11.)

6         In another instance, the judge, outside the presence of the jury, warned Freeman about

7    her inappropriate behavior while E. was testifying. He stated, in part:

8         I have observed, and it's been brought to my attention, that the
         defendant, Miss Freeman, is by various hand motions, and thing that you're
9         holding, Miss Freeman, your facial contortions and other means of non-verbal
         communication, that you are communicating with your daughter, who is
10        testifying in this case.  I'm going to tell you, I'm going to make it abundantly
         clear to you, and you know better because you're an officer of the court, that if
11        you continue to do that, I'll have no recourse but to have you, Miss Freeman,
         removed from this courtroom, and the case will proceed accordingly.

12

13   (Resp't Lodgment No. 2 at 2162.)

14        Finally, outside the presence of the jury, the judge again warned Freeman about her

15   inappropriate behavior and interference with defense counsel's questioning of witnesses,

16   stating:

17        [T]he constant interfering with Mr. Apgar's questioning, the constant
         writing of questions and giving to him, the constant no listening to his advice
18        and indicating, for the record, that you've been observed, and I'll use the term,
         bickering at Mr. Apgar.  You pull on his sleeve.  You tell him to ask this
19        question.  You tell him to ask that question. [¶] And what you've done, quite
         frankly, Miss Freeman, is because you are not well-versed in the evidence
20        code, that's very clear, and you have no familiarity with a criminal case,
         you've opened the door on numerous occasions by demanding things that Mr.
21        Apgar, he's told you, you shouldn't go there.  I made evidentiary rulings in this
         case and then you turn right around and open the door.  So you've only, I
22        guess, after a fashion, harmed yourself because you won't listen.

23   (Resp't Lodgment No. 2 at 2647.)

24        None of Judge O'Neill's comments suggest bias on his part.  Indeed, in light of

25   Freeman's behavior, Judge O'Neill showed exceptional patience.  And to the extent he may

26   have expressed some exasperation with Freeman's antics, his comments fall well short of

27   suggestion actual bias on his part.  *See Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir.

28   2008) (finding that a judge's "impatient remarks" to a defendant are generally insufficient to

1   overcome the presumption of judicial integrity).

2        Based on the foregoing, the Court finds that the state court's denial of Freeman's due

3   process claim was neither contrary to, nor an unreasonable application of, clearly established

4   law.  *Williams*, 423 U.S. at 412-13. The Court recommends the claim be DENIED.

5                    **B.   Sufficiency of Evidence**

6        Freeman contends her convictions for stalking, burglary, solicitation to kidnap and

7   misdemeanor child endangerment and battery were not supported by sufficient evidence and

8   as such, her due process rights were violated.  (Pet. at 88-100.)  With regard to the stalking,

9   burglary and kidnap convictions, Respondent counters that the state court's denial of these

10  claims was neither contrary to, nor an unreasonable application of, clearly established law.

11  (Answer at 30-38.)  As to the child endangerment conviction, Respondent argues the claim is

12  unexhausted and without merit.  (*Id.* at 37-39.)

13                    ***1.   Clearly Established Law***

14       The clearly established law regarding sufficiency of the evidence claims is set forth in

15  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In *Jackson*, the Supreme Court held that the

16  Fourteenth Amendment's Due Process Clause is violated "if it is found that upon the

17  evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a

18  reasonable doubt."  *Jackson*, 443 U.S. at 324; *see also Juan H. v. Allen*, 408 F.3d 1262, 1275

19  (9th Cir. 2005).

20       In analyzing Freeman's sufficiency of the evidence claim, the Court must engage in a

21  thorough review of the state court record and view the evidence in the "light most favorable

22  to the prosecution and all reasonable inferences that may be drawn from this evidence."

23  *Juan H.*, 408 F.3d at 1275 (citing *Jackson*, 443 U.S. at 319).  "Circumstantial evidence and

24  inferences drawn from that evidence may be sufficient to sustain a conviction."  *Walters v.*

25  *Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318,

26  1323 (9th Cir.) *amended on denial of reh'g*, 798 F.2d 1250 (9th Cir. 1986).  A petitioner

27  faces a "heavy burden" when seeking habeas relief by challenging the sufficiency of

28  evidence used to obtain a state conviction on federal due process grounds.  *Juan H.*, 408 F.3d

1    at 1275.

2    / / /

3                    **2.    *Stalking***

4          Freeman claims there was insufficient evidence to support her stalking conviction.

5    Specifically, she alleges she followed E.'s foster parents only to ensure her daughter was safe

6    which was a legitimate exercise of her parental rights.  (Pet. at 91-92.)  She also claims no

7    evidence was presented to show a credible threat with intent to cause fear.  (*See id.* at 89.)

8    Finally, she states there was no evidence that a reasonable person would have suffered

9    "substantial emotional distress" or that E.'s foster parents actually suffered such distress.  (*Id.*

10   at 90.)

11                    a.      State Court Decision

12         Freeman presented these claims to the California Supreme Court in her petition for

13   review, which was denied without comment or citation.  (Resp't Lodgment No. 8.)  The last

14   reasoned decision, to which this court must defer, is that of the California Court of Appeal.

15   *Ylst*, 501 U.S. at 801-06.  The court denied the claim, stating:

16              A trial court's evaluation of a motion for acquittal is governed by the
           same substantial evidence test used in an appellate challenge to the sufficiency
17         of the evidence, i.e., the trial court determines "whether from the evidence then
           in the record, including reasonable inferences to be drawn therefrom, there is
18         substantial evidence of every element of the offense charged."  (*People v.
           Coffman and Marlow* (2004) 34 Cal.4th 1, 89, 17 Cal.Rptr.3d 710, 96 P.3d 30.)
19         If the record can reasonably support a finding of guilt, a motion for acquittal
           must be denied even if the record might also justify a contrary finding.  (*See*
20         *People v. Holt* (1997) 15 Cal.4th 619, 668, 63 Cal.Rptr.2d 782, 937 P.2d 213.)

21              At the time Freeman engaged in the alleged offenses, the crime of
           stalking was defined as committed by "[a]ny person who willfully, maliciously,
22         and repeatedly follows or harasses another person and who makes a credible
           threat with the intent to place that person in reasonable fear for his or her
23         safety, or the safety of his or her immediate family. . . ." (Former § 646.9, subd.
           (a).)  The elements of the stalking offense are (1) repeatedly following or
24         harassing another person, (2) making a credible threat, (3) intent to place the
           person in reasonable fear for the safety of the person or his or her family, and
25         (4) causing actual fear.  (*See People v. Norman* (1999) 75 Cal.App.4th 1234,
           1239, 89 Cal.Rptr.2d 806; *People v. Carron* (1995) 37 Cal.App.4th 1230,
26         1238-1239, 44 Cal.Rptr.2d 328.)

27              Section 646.9, subdivision (e) defined harassment as "a knowing and
           willful course of conduct directed at a specific person that seriously alarms,
28         annoys, torments, or terrorizes the person, and that serves no legitimate
           purpose.  This course of conduct must be such as would cause a reasonable

                                    -26-

person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person." Course of conduct was defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.'" (§ 646.9, subd. (f).) A credible threat was defined as a verbal or written threat, or a threat "implied by a pattern of conduct" made with the intent to place the victim in reasonable fear for his or her safety or the safety of his or her family and made with the apparent ability to carry out the threat so as to cause such fear. (§ 646.9, subd. (g).) The fear suffered by the victim need not be experienced simultaneously with the commission of the act designed to generate the fear; thus, stalking is committed even when the victim learns of the defendant's conduct some time after its occurrence. (*People v. Norman*, supra, 75 Cal.App.4th at pp. 1238-1241, 89 Cal.Rptr.2d 806.)

Freeman argues: (1) her conduct of following E.'s foster parents served the legitimate purpose of furthering her fundamental right to parent; (2) there was no evidence she issued a credible threat with the intent to cause fear; and (3) there was no evidence that a reasonable person would have suffered substantial emotional distress or that the foster parents actually suffered such distress.

1.  Fundamental Right to Parent

We agree that a parent has a fundamental right to parent, and also agree that if the record had shown as a matter of law that Freeman's conduct reflected a legitimate exercise of this right, the jury's verdict could not stand. However, Freeman's contention is belied by a record that provides ample evidence from which the jury could conclude that Freeman's conduct was inconsistent with efforts to assert parental rights or to merely monitor the well-being of her child while in foster care. Evidence was presented showing that Freeman engaged in conduct that did nothing to inform her about her daughter's well-being and that in some instances seriously threatened her daughter's safety. This included making plans to "steal" her daughter, breaching the confidentiality of the foster placement, breaking into the foster parents' home when her daughter was not there, pursuing the foster parents and her daughter at dangerously high speeds on a Los Angeles freeway, turning off her vehicle lights while following them at night, following Gonzalez and her daughter on the San Diego streets and glaring at Gonzalez, spying on the foster parents at their residence and other places, and spraying Gonzalez's car with her perfume. When viewed in its totality, a jury could reasonably conclude Freeman's actions were unrelated to E.'s well-being, and did not serve the legitimate purpose of advancing Freeman's fundamental right to parent.

To support her argument that she should have been acquitted of the stalking charges based on the fundamental right to parent, Freeman asserts that no evidence was introduced showing that she was precluded by court order from contacting her daughter during the time period of her alleged criminal behavior. Regardless of whether a formal no-contact order had been entered, such an order was not dispositive on the issue of stalking. Even if Freeman was permitted contact with her daughter, a jury could reasonably conclude that the means Freeman chose to monitor her daughter's foster placement exceeded the legitimate exercise of parental rights.

2. Credible Threat with Intent to Cause Fear

-27-

Freeman argues that the evidence did not show a credible threat with intent to cause fear because she consistently tried to hide her identity and she was motivated by a concern for her daughter and a desire for reunification with her.  Because intent is inherently difficult to prove by direct evidence, the trier of fact can properly infer intent from the defendant's conduct and all the surrounding circumstances.  (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1099, 10 Cal.Rptr.2d 821.)

Regardless of Freeman's attempts to hide her identity and her expressed concerns for her daughter, the evidence shows she acted in a manner inconsistent with an intention to merely check on her daughter's welfare without frightening the foster parents.  On October 19 Freeman engaged in a lengthy, dangerous pursuit on a Los Angeles freeway.  Freeman told Oakley that she was "really proud" she had chased them on a Los Angeles freeway and glad she had "really scared" them during the ordeal.  A few days later, on October 23, she again followed one of the foster parents in her vehicle and glared at the foster parent "in [an] evil manner."  On November 3 Freeman stationed herself in a van by the foster parents' apartment and sped off after she was spotted by one of the foster parents.  The foster parents ascertained that Freeman had sprayed perfume in their car.  The foster parents were aware that Freeman had been resourceful enough to find their address even though the foster placement was confidential, and they informed she had likely broken into their apartment.

Freeman's brazen burglary into the school to retrieve the foster parents' address from the computer, followed by her late night burglary into their residence, her reckless pursuit of them on a Los Angeles freeway, her glaring at Gonzalez when her identity was discovered, and her entry into Gonzalez's car to spray perfume, do not reflect surveillance conduct carried out with no intent to cause fear or no ability to carry out a threat.  Further, the jury could reasonably consider that stalking by an unidentified person wearing a disguise can be even more ominous than stalking by an identified person, and that the foster parents were in the frightening position of being unable to stop the surveillance as long as they could not provide a positive identification.  The fact that Freeman may have believed she was acting out of concern for her daughter and as a means to reunify did not mean that the jury could not conclude she chose to advance her goals by intentionally terrifying the foster parents.  Viewing the circumstances in their totality, the jury could reasonably conclude that Freeman intentionally imbued her conduct with a sinister tone, and that she engaged in conduct that would inevitably convey to the foster parents her ability and desire to go to great lengths to spy on them and frighten them.  The evidence supports a finding that Freeman intended to, and did, communicate a credible threat with the intent to cause fear.

Freeman posits that to the extent her course of conduct showed she committed the "follow[ing] or harass[ing]" element of stalking, that same conduct cannot be used to establish the "credible threat" element of stalking.  The argument is unavailing.  The fact that the same conduct may overlap to establish more than one element of an offense does not defeat the sufficiency of the evidence to support each element.  We are not persuaded by Freeman's suggestion that the Legislature intended to require distinct conduct to show harassment and a credible threat because it defined harassment as a "course of conduct" whereas it defined an implied credible threat as arising from a "pattern of conduct." (§ 646.9, subds.(e), (g), italics added.)  When read in its entirety, it is clear that the different definitional subdivisions of section 646.9 merely elaborate on the required elements, which in essence require a harassing

course of conduct accompanied by a credible threat, the latter which may be implied by a pattern of conduct. Indeed, in subdivision (f) of section 646.9, the Legislature defined "course of conduct" for harassment as meaning a "pattern of conduct," thus using the two terms interchangeably. (Italics added.)

To support her assertion that there was no evidence she intended to place the foster parents in fear for their safety, Freeman notes that notwithstanding repeated opportunities to do so, she never issued an express verbal or written threat to them. The argument fails because the statute does not require an express threat; an implied threat from a pattern of conduct suffices.

3. Substantial Emotional Distress Caused by Harassment

There was also sufficient evidence for the jury to find that a reasonable person would have suffered substantial emotional distress from Freeman's stalking, and that the foster parents did in fact suffer substantial emotional distress. Substantial emotional distress within the meaning of the stalking statute means "something more than everyday mental distress or upset. . . . [T]he phrase . . . entails a serious invasion of the victim's mental tranquility." (*People v. Ewing* (1999) 76 Cal.App.4th 199, 210, 90 Cal.Rptr.2d 177.) The foster parents first became aware they were being followed on October 19; they again knew they were being followed on October 23 and discovered Freeman's identity; and on November 3 they knew someone was watching their apartment. They described their extreme fear during a Los Angeles freeway pursuit, and their ever-increasing fear and distress as the stalking continued and they discovered their pursuer was E.'s mother. They knew that Freeman had succeeded in breaking through the confidentiality of the foster placement, and discovered she had likely entered their vehicle to spray perfume and broken into their apartment. Franco testified she did not know what Freeman was capable of, particularly given her past behavior towards her daughter.

Contrary to Freeman's assertion, the fact that Franco and Gonzalez chose to be foster parents and to thereby take the risk of exposure to confrontations with disgruntled birth parents did not require the jury to find a foster parent would not reasonably experience substantial distress when subjected to the prolonged type of conduct that occurred here. The record contains a full description of the foster parents' fearful reaction to Freeman's conduct and its lingering deleterious effects on their well-being, including nightmares, loss of sleep, and a sense of helplessness and vulnerability. This evidence was sufficient to support a finding that a reasonable person would have suffered substantial emotional distress, and that the foster parents experienced this type of distress.

Freeman further maintains that it was E.'s unverified descriptions of her mother's previous assaultive behavior that caused the foster parents' fear, rather than the conduct committed by Freeman towards the foster parents. The jury was not required to reach this conclusion. As stated, Freeman engaged in stalking conduct that started with a reckless vehicular chase on the freeway, more vehicular following, glaring, spying at their residence, and spraying of perfume in their car. Later, the foster parents discovered she had taken pictures of them and even broken into their apartment. Although E.'s descriptions of her mother's behavior may have served to heighten the foster parents' fear, the record supports a finding that Freeman's stalking was itself a terrifying ordeal for the foster parents.

1   (Resp't Lodgment No. 13 at 16-23.)

2   ///

3   ///

4

5                       b.        Discussion

6          The state court's denial of Freeman's claim was neither contrary to, nor an

7   unreasonable application of, clearly established law.  First, contrary to Freeman's assertion

8   set forth in her Traverse (*see* Traverse at 52), the California Court of Appeal applied the

9   appropriate federal standard in reviewing Freeman's claims of insufficient evidence.

10   Although the appellate court refers to the "substantial evidence test," this test is the same as

11   the standard set forth in *Jackson*.  The appellate court cited to *People v. Coffman*, 34 Cal. 4th

12   1, 89 (2004) for the proposition that denial of a defendant's motion for acquittal is governed

13   by the same test applied in sufficiency of the evidence challenges.  *Coffman*, in turn, cites to

14   *People v. Johnson*, 26 Cal. 3d 557 (1980) as the standard for reviewing petitioner's

15   sufficiency of the evidence claim.  In *Johnson*, the California Supreme Court expressly held

16   that the standard of review it was applying was consistent with the principles of *Jackson*.  *See*

17   *Johnson*, 26 Cal.3d 575-78; *see also People v. Cuevas*, 12 Cal. 4th 252, 260 (1995).  Since

18   then, the Ninth Circuit has made clear that the *Johnson* standard is not contrary to clearly

19   established Supreme Court precedent.  *See Juan H*., 408 F.3d at 1274 (the California Court of

20   Appeal's reliance on the *Johnson* standard was not "fundamentally at odds with Supreme

21   Court precedent"); *see also Clark v. Carey*, 100 Fed. Appx. 623, *2 (9th Cir. 2004) ("It is

22   undisputed that California courts use the *Jackson* standard when reviewing

23   claims of insufficient evidence." (citing *Johnson* and *Cuevas*.)).  Thus, the court of appeal

24   applied the appropriate federal standard.

25          The state court's application of that standard was not unreasonable. At the time

26   Freeman was convicted, Penal Code section 646.0(a) stated, in relevant part:

27          [a]ny person who willfully, maliciously, and repeatedly follows or harasses
            another person and who makes a credible threat with intent to place that person
28          in reasonable fear for his or her after, or the safety of his or her immediate
            family, is guilty of the crime of stalking.

Cal. Penal Code § 646.9(a) (West 2000).

First, there was sufficient evidence that Freeman's conduct served no legitimate purpose. "Harassment" was defined as "knowing and willful course of conduce directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." Cal. Penal Code § 646.9(e). Constitutionally protected activity is not included within the meaning of "course of conduct." Cal. Penal Code § 646.9(f). Thus, for purposes of stalking, the following or harassment must be done without a legitimate purpose. Although Freeman claims she followed E. out of parental concern, a reasonable juror could have concluded otherwise. Freeman took steps to discover who E.'s foster parents were and learn their address, despite E.'s confidential placement. Evidence was presented that showed Freemen followed Franco and Gonzalez and took photographs of them going about their daily activities, even when E. was not in their presence. (Resp't Lodgment No. 2 at 1038-1042, 1438-1441, 1996-2001.) Freeman followed Franco and Gonzalez and discovered where Franco's mother lived. (*Id.* at 1028-29.) She took photos of Franco's mother's house and car. (*Id.* at 1040.) She documented when Franco and Gonzalez came and went from their home. (*Id.* at 1991-92.) She also sprayed her perfume into the foster family car. (*Id.* at 1753.) While Freeman claims this was an attempt to relay her affections to her daughter, a reasonable juror could conclude that Freeman was trying to intimidate Franco and Gonzalez by showing that she was watching them and knew where they were.

In addition, Freeman chased the foster family to Los Angeles, pursuing them for over an hour and a half, at speeds up to 95 miles per hour. (*Id.* at 999-1007.) On another occasion, she followed the family at night and turned off her lights when the family exited the freeway in an attempt to evade her. (*Id.* at 1430-31.) Oakley testified that Freeman told her she was happy to have apparently scared the foster family when she chased them on the freeway to Los Angeles. (*Id.* at 1752-53.) Viewing this evidence in the light most favorable to the state, a reasonable juror could have concluded Freemen followed Franco and Gonzalez for no legitimate purpose, but rather to harass and intimidate her daughter's foster parents.

1       Furthermore, there was sufficient evidence presented that Freeman was a "credible

2  threat" and acted with intent to cause fear.  California Penal Code section 646.9(g) defines

3  "credible threat" as:

4          a threat implied by a pattern of conduct or a combination of verbal, written, or
           electronically communicated statements and conduct made with the intent to
5          place the person that is the target of the threat in reasonable fear for his or her
           safety or the safety of his or her family and made with the apparent ability to
6          carry out the threat so as to cause the person who is the target of the treat to
           reasonably fear for his or her safety of his or her family.  It is not necessary to
7          prove that the defendant had the intent to actually carry out the threat.

8  Cal. Penal Code § 646.9(g).

9       Freeman's pursuit of the family on the Los Angeles freeway alone is sufficient for a

10 reasonable juror to conclude she intended for E.'s foster parents to fear for their safety and

11 the safety of their family members.  She chased the family at dangerously excessive speeds

12 and when the foster family exited the freeway in an attempt to end the pursuit, Freeman

13 continued following them but turned off her headlights.  (Resp't Lodgment No. 2 at 999-

14 1007.)  As already discussed, Freeman told Oakley that he was pleased to have scared the

15 family during the chase.  (*Id.* at 1752-53.)

16      In her Petition, Freeman denies pursuing Franco and Gonzalez to Los Angeles and

17 asserts claims Oakey's testimony about the "chase" was fabricated.  Furthermore, she claims

18 that Gonzalez was chasing *her* on October 23.  (*See* Pet. at 88-89, 92-93.)  She also denies

19 having sprayed perfume in Gonzalez's car.  (*Id.* at  94.)  When reviewing the sufficiency of

20 the evidence, however, a court does not reweigh the evidence or redetermine issues of

21 credibility resolved by the jury.  *See Bruce v. Terhune*, 376 F.3d 950, 958 (9th Cir.2004);

22 *Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000).  Rather, the reviewing court must presume

23 the "trier of fact resolved any such conflicts in favor of the prosecution, and must defer to

24 that resolution."  *Jackson,* 443 U.S. at 319.  Applying that standard, the Court finds there is

25 more than enough evidence to conclude Freeman intended to (and did) communicate a

26 credible threat with intent to cause fear.

27      Next, the state court's conclusion that there was sufficient evidence that Franco and

28 Gonzalez suffered substantial emotional distress from Freeman's stalking was reasonable.

As the appellate court noted, "the phrase 'substantial emotional distress' entails a serious invasion of the victim's mental tranquility." *People v. Ewing*, 76 Cal. 4th 199, 210 (1999). Franco testified that she began to fear for the safety of her family as Freeman's actions continued to reveal how much Freeman knew about her family, despite the confidentiality of E.'s foster placement. (*Id.* at 1042-43.) Franco felt anxious, helpless and violated. (*Id.* at 1220.) Gonzalez also suffered. She stated that as a result of Freeman's actions, she had trouble sleeping, had nightmares and missed work. (*Id.* at 1032, 1210, 1441, 1956.) Franco and Gonzalez ultimately moved into a new home out of fear for their safety. They had their mail delivered to a private box in a different city, as opposed to their home or a nearby post office box, in an effort to keep their address private. (*Id.* at 1043.) Thus, sufficient evidence was presented which could lead a reasonable juror to concluded both Franco and Gonzalez suffered substantial emotional distress. *See Juan H.*, 408 F.3d at 1275.

Accordingly, the state court's denial of Freeman's claim was neither contrary to, nor an unreasonable application of, clearly established federal law. *Williams*, 423 U.S. at 412-13. The Court recommends the claim be DENIED.

### 3.   *Burglary*

Petitioner next claims there was insufficient evidence to support her burglary conviction. She raised this claim in her petition for review to the California Supreme Court and it was denied without comment. (Resp't Lodgment Nos 14, 15.) The last reasoned state court decision is that of the California Court of Appeal, which denied the claim, stating:

> The prosecution's theory of the burglary charge was that Freeman intended to facilitate her stalking objective when she entered the residence, and the jury was instructed that stalking was the felony underlying the burglary charge. Freeman argues there was no evidence she intended to commit a felony when she entered the foster parents' apartment, and thus she only committed trespass.
>
> Burglary is committed when a person enters a house with the intent to commit theft or any felony. (§ 459.) The defendant need not intend to actually accomplish the felony in the residence; it is sufficient if the "entry is 'closely connected' with, and is made in order to facilitate, the intended crime." (*People v. Griffin* (2001) 90 Cal.App.4th 741, 749, 109 Cal.Rptr.2d 273.) The intent to commit the felony may be inferred from all the facts and the circumstances of the case. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245, 75 Cal.Rptr.2d 40.)

-33-

The evidence is sufficient for the jury to reasonably infer Freeman's entry into the foster parents' residence on October 11 was closely connected with and made to facilitate her stalking of the foster parents.  Prior to October 11, Freeman had already commenced her surveillance of the foster parents and she had formulated plans to remove E. from the foster placement without authorization.  She had asked Oakley to press the Calvary Chapel youth pastor for information about E., and had repeatedly asked Oakley to help her "steal" E. from the foster family.  She had broken into the school to retrieve the foster parents' address from the computer and had been watching and following the foster parents for "quite some time."  When Freeman exited the residence on October 11, she was elated that she had taken pictures and acquired information about the foster mothers.

From these circumstances, the jury could infer that Freeman entered the residence with a view to obtaining whatever information she could to advance her plan to interfere with the foster placement, which included intimidating the foster parents.  Although the activity that first frightened the foster parents did not occur until after the October 11 entry into the apartment (when the foster parents detected they were being followed), the jury could reasonably infer that from the inception of her surveillance efforts in early October Freeman intended to engage in whatever was necessary to carry out her goal of disrupting the foster placement, including following and frightening the foster parents.  Based on this inference, there was sufficient evidence to support a finding that Freeman entered the apartment to facilitate her plans to commit stalking by harassing and intimidating the foster parents.

Freeman asserts the evidence shows her only intent when she entered the residence was to determine whether her daughter was safe.  The jury was not required to draw this inference.  Although Freeman told Oakley she wanted to know if her daughter was all right, Freeman entered the residence when it appeared her daughter was not at home.  From this, the jury could infer Freeman knew she would not acquire any immediate information about her daughter's well-being, and that her intent was to try to get information to effectuate her plans to harass the foster parents.  As noted, although Freeman's overall goals may have been to carry out what she thought was necessary to protect her daughter and to regain custody, this did not preclude an inference that she intended to unlawfully stalk the foster parents to accomplish her goals.

Given the sufficiency of the evidence to support entry with the intent to commit stalking, we need not discuss Freeman's contention that the evidence was insufficient to show she intended to commit theft when she entered the residence.

(Resp't Lodgment No. 13 at 27-29.)

The state court's decision was neither contrary to, nor an unreasonable application of

clearly established law.  As the appellate court noted, under California law, a person who

enters a residence with intent to commit a felony is guilty of burglary.  Cal. Penal Code

§ 459.  Here, there was ample evidence presented that Freeman entered the foster family's

apartment with intent to further her stalking of Franco and Gonzalez.  Oakley testified she

went with Freeman to the foster mothers' apartment late in the evening on October 11, 2002. (Resp't Lodgment No. No. 2 at 1744.)  After watching the apartment for a time, Freeman said she was tired of watching and was going inside.  Oakley testified Freeman climbed over a wall and entered the apartment through an open  sliding glass door.  (*Id.* at 1746-48.) While inside, Freeman rummaged through drawers, took photographs, and looked over an address book she found.  (*Id.* at 1748.)  Oakley stated Freeman appeared "giddy" after emerging from the house and seemed elated to have discovered personal information about the family, in particular, that Franco and Gonzalez shared a bedroom.  (Resp't Lodgment No. 2 at 1752-53.)

Oakley's testimony alone provides ample evidence that Freeman entered the foster family's apartment.  Furthermore, a reasonable juror could conclude that Freeman's actions once inside, such as going through an address book, taking pictures and searching through drawers, were an attempt gather personal information about the family in order to further her stalking and harassment of the couple.  *See People v. Sanghera*, 139 Cal. App. 4th 1567, 1574 (2006).  This evidence, when viewed in the light most favorable to the prosecution, is sufficient to support the burglary conviction.  *See Jackson,* 443 U.S. at 319.

In her Petition, Freeman argues she only went to the apartment to check on the welfare of E, and that she never entered the apartment.  (Pet. at 96-98.)  She testified to this at trial. (*See* Resp't Lodgment No. 2 at 2516-2520, 2522.)  It was for the jury to resolve any inconsistencies between Oakley's and Freeman's versions of events.  *See Bruce*, 376 F.3d at 958.  Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law.  *Williams*, 423 U.S. at 412-13.  The Court recommends the claims be DENIED.

### 4.    *Solicitation to Kidnap*

Freeman claims there was insufficient evidence to support her conviction for solicitation to kidnap.  She asserts that solicitation to commit a crime "requires the testimony of two witnesses to the actual act of solicitation" and that in her case, only Oakley testified about the solicitation.  (Pet. at 98-99.)  Freeman raised this claim for the first time in her

petition for review to the California Supreme Court and it was denied without comment or citation.[5]  (Resp't Lodgment Nos. 14, 15.)  Because there is no reasoned state court decision to which this Court can defer, it must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Himes*, 336 F.3d at 853.

Under California law, solicitation consists of "asking another to commit one of the crimes specified in Penal Code section 653f with the intent that the crime be committed." *People v. Miley*, 158 Cal. App.3d 25, 33 (1984).  Kidnaping requires "(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." *People v. Jones*, 108 Cal. App. 4th 455, 462 (citing Cal. Penal Code § 207(d)).

Contrary to Freeman's assertion, solicitation need not be proved by two witnesses. Under California law, solicitation must be established by "the testimony of two witnesses, *or of one witness and corroborating circumstances*."  Cal. Penal Code §653f(f) (emphasis added).  California court's have held that the "corroborative evidence need not be strong nor even sufficient in itself, without the aid of other evidence, to establish the fact." *People v. Baskins,* 72 Cal. App. 2d 728, 731 (1946); *People v. Burt*, 45 Cal. 2d 311, 316 (1955).  Such evidence "may be slight and, when standing by itself, entitled to but little consideration." *People v. Negra*, 208 Cal. 64, 69 (1929).  Corroborative evidence is sufficient "if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the trier of fact that the witness who must be corroborated is telling the truth." *People v. Rissman*, 154 Cal. App. 2d 265, 277 (1957); *People v. MacEwing*, 45 Cal. 2d 218, 224 (1955).

---

[5]  On direct appeal to the California Court of Appeal, Freeman argued there was insufficient evidence to support her conviction for solicitation to kidnap but the theory was entirely different from that presented in Freeman's federal petition.  In the court of appeal, Freeman argued that she should have been charged under the more specific "child abduction" statute; that she was immune from culpability in attempting to kidnap her own child and there was no evidence that she intended for Oakley to use force or fear to carry out the kidnap.  (*See generally*, Resp't Ldogment No. 78-101.)  Freeman did not raise any of these issues in her petition for review to the Supreme Court, nor she does not raise them in her federal petition.

The jury in Freeman's case was specifically instructed that there must be direct testimony and corroborating circumstances in order to find Freeman guilty of solicitation. (Resp't Lodgment No. 1 at 167-68.)  The jury was further instructed that:

> Corroborating circumstances may be shown by acts, declarations, or conduct of the defendant, or by any evidence independent of the testimony of the one witness who has testified to the solicitation, which in and of itself tend to connect the defendant with the commission of the crime of soliciting. To be sufficient, the corroborating circumstances, by themselves, must create more than a suspicion of guilt. However, they need only be slight, and by themselves need not be sufficient to prove guilt.

(Resp't Lodgment No. 1 at 167-68; *see also* CALJIC No. 6.35.)

Here, Oakley's testimony clearly provided the bulk of the evidence to support Freeman's solicitation conviction.  She stated that Freeman told her she need Oakley to "steal [E.] from the foster family."  (Resp't Lodgment No. 2 at 1760.)  Freeman suggested Oakley lure E. out of the foster family's home and convince her to come to the car, where Freeman would be waiting.   Freeman would then "take off" with E.  (*Id.* at 1760.)  On another occasion, Freeman asked Oakley to go to the YMCA after-school program E. attended and lure E. out to Freeman's car by telling her how much Freeman missed her.  Freeman suggested that she would be waiting and would take E. away.  (*Id.* at 1761.)  Freeman also asked Oakley to hide E. at her rural home.  (*Id.* at 1762.)

Oakley's testimony was corroborated by evidence that Freeman was obsessed with getting E. back, and that her obsession had already led Freeman to break into the foster family's home, chase them at high speeds, and follow them as they went about their daily lives.  There was evidence that Freeman wore disguises and drove different vehicles to evade detection when she was stalking the family.  Wigs, and rental car receipts were found in the trailer after her arrest.  (*Id.* at 3005; *see also id.* at 2978-80.)  Oakley also testified that Freeman told here several times that she kept large sums of money on her person at all times in case an opportunity to snatch E. presented itself, she could escape across the Mexican or Canadian border with her.  (Resp't Lodgment No. 2 at 1755.)  This was corroborated by the fact that Freeman was found with over $6000 in cash on her when she was arrested.  (*Id.* at 2982-93.) When standing alone, this evidence may not be sufficient to support a solicitation

1    conviction but that is not what California law requires.  *See Negra*, 208 Cal. at 69.  Rather,

2    the state must merely present corroborating evidence sufficient to "reasonably satisfy" the

3    jury that Oakley testified truthfully.  *See Rissman*, 154 Cal. App. 2d at 277.   In this case, the

4    evidence was sufficient.

5         The state court's denial of this claim was neither contrary to, nor an unreasonable

6    application of, clearly established law.  *Williams*, 423 U.S. at 412-13.  The Court

7    recommends the claims be DENIED.

8                              *5.        Child Endangerment and Battery*

9         Freeman contends there was not sufficient evidence to support her convictions for one

10   count of misdemeanor battery (count 5) and two counts of misdemeanor child endangerment

11   (counts 6 and 7).  (Pet. at 99-100.)  Respondent argues Freeman failed to present this claim to

12   the California Supreme Court and therefore it is unexhausted.  Furthermore, Respondent

13   asserts, the claim is without merit.  (Answer at 37-39.)

14        The exhaustion of available state judicial remedies is a prerequisite to a federal court's

15   consideration of claims presented in habeas corpus proceedings.  28 U.S.C. § 2254(b); *see*

16   *Rose v. Lundy*, 455 U.S. 509, 522 (1982).  To satisfy the exhaustion requirement, a federal

17   habeas petitioner must "provide the state courts with a 'fair opportunity' to apply controlling

18   legal principles to the facts bearing upon his constitutional claim."  *Anderson v. Harless*, 459

19   U.S. 4, 6 (1982) (quoting *Picard*, 404 U.S. at 276-77).  Also, the petitioner must have "'fairly

20   presented' to the state courts the 'substance' of his federal habeas corpus claim."  *Anderson*,

21   459 U.S. at 6 (quoting *Picard*, 404 U.S. at 275, 277-78).  The Supreme Court has stated "it is

22   not sufficient merely that the federal habeas applicant has been through the state courts."

23   *Picard*, 404 U.S. at 275-76.  Instead, the petitioner must "present the state courts with the

24   same claim he urges upon the federal courts."  *Id.* at 276.

25         This Court has combed through the record and can find nothing to indicate Freeman

26   raised this claim in the California Supreme Court.  In her petition for review to the state

27   supreme court, she asserted generally that she was "innocent of all these crimes" (*see* Resp't

28   Lodgment No. 14 at 3).  Nowhere in the petition for review, however, did Petitioner claim

                                          -38-

that her convictions for counts 5, 6 and 7 were based on insufficient evidence in violation of her due process rights.  Accordingly, because these claims were not "fairly presented" to the state supreme court, they are unexhausted.  *See Anderson*, 459 U.S. at 6.

Notwithstanding the total-exhaustion rule in *Rose*, federal district courts have the discretion to deny a habeas "application" on the merits despite a petitioner's failure to fully exhaust state judicial remedies.  *See* 28 U.S.C. § 2254(b)(2).  A federal court may deny an unexhausted claim on the merits when it is "perfectly clear" the claim is without merit. *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).

It is clear Freeman's convictions for misdemeanor battery and child endangerment were based on sufficient evidence.  Freeman was charged with battery and once count of child endangerment based on the physical abuse reported by E. on September 10, 2002. (*See* Resp't Lodgment No. 1 at 002-003; *see also* Resp't Lodgment No. 2 at 3006-007.)  Under California law, battery is defined as "willful and unlawful use of force or violence upon the person of another."  Cal. Penal Code §242; *see also* Resp't Lodgment No. 1 at 179.  A person is guilty of child endangerment when "one willfully causes or permits the person or health of a child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered."  Cal. Penal Code §273a(b).

At trial, evidence was presented that on September 10, 2002, Freeman had physically abused E.  E.'s call 911, reporting the incident was played for the jury.  E. told authorities Freeman had grabbed her head and beat it against the wall and kicked her.  (*See* Resp't Lodgment No. 1 at 229-30; Resp't Lodgment No. 2 at 898-900, 905.)  Sheriff Deputy Margaret Barone[6] responded to the call and testified that when she arrived at the trailer, E. had been crying and was visibly shaken.  (Resp't Lodgment No. 899-900.)  Deputy Barone and a nurse who later evaluated E.'s injuries both testified that E. had a large welt on her upper thigh, another on her calf, scratches on her arm and bruising on her right hip.  (Resp't Lodgment No. 2 at 900-03; 936-38; 941-42.)  Photographs of the injuries were shown to the

_____

[6] Deputy Barone was married during the course of the proceedings and is also referred to as "Deputy Keullenberg" in portions of the record.

-39-

jury.  (*Id.* at 902-03.)  E. told the nurse the bruises were a result of her mother kicking her.

(*Id.* at 938.)  On September 12, 2002, E. was evaluated again, this time by Dr. Carstairs.  E.

told Dr. Carstairs that her mother had assaulted her.  (*Id.* at 2380.)  This evidence is sufficient

to support the battery and child endangerment charges based on the September 10, 2002

incident.

The second count of child endangerment was based on the conditions of the trailer in

which E. was living during at that time.  (*See* Resp't Lodgment No. 1 at 002-003; *see also*

Resp't Lodgment No. 2 at 3006-007.)  Under California law, extremely filthy and unsanitary

living conditions may constitute child endangerment.  *See People v. Little*, 115 Cal. App. 4th

766, 722 (2004); *People v. Odom*, 226 Cal. App. 3d 1028, 1033 (1991).  Several witnesses,

including E., testified as to the unsanitary condition of the trailer on September 10, 2002.

Deputy Barone described the trailer as "filthy," with a strong odor of feces, dirty dishes,

spoiled food and ants in the kitchen.  Clothes and papers were strewn about the trailer as if

"somebody had rampaged through the place and tore it up."  (*Id.* at 910.)  She stated that she

could not enter the trailer more than a few feet because of all the clutter, trash and debris.

(*See* Resp't Lodgment No. 2 at 909-11.)  The jury was shown photographs of the condition of

the trailer.  (*Id.* at 911.)  E.'s testimony corroborated Deputy's Barone's description.  She

admitted that the trailer was "filthy" and "disgusting."  (Resp't Lodgment No. 2 at 2208.)

Soiled toilet paper was strewn around the toilet because it could not be flushed.  (Resp't

Lodgment No. 2 at 2209.)   All of this evidence, when viewed in the light most favorable to

the prosecution, is clearly sufficient to support the second count of child endangerment.

E.'s recantation of her report of abuse does not render the evidence insufficient.

Although E. testified at trial that she had lied about the abuse, during cross-examination,

several letters and emails written by E. were introduced, all of which described the abuse in

detail.  (Resp't Lodgment No. 2 at 2207, 2216-17; 2220-21.)  It was within the jury's

province to determine whether E.'s reports immediately after the incident or her in-court

recantation was more credible.  *Bruce*, 376 F.3d at 957 ("A jury's credibility determinations

are [ ] entitled to near-total deference under *Jackson*.").  Accordingly, the Freeman's claim is

1   clearly without merit.  *See Cassett v. Stewart*, 406 F.3d at 623-24.  The Court recommends

2   the claim be DENIED.

3        **C.     Prosecutorial Misconduct**

4        Although not presented as a distinct individual claim, Freeman alleges several

5   instances of prosecutorial misconduct in her Petition.  (*See generally* Pet. at 57-60.)  She

6   claims that the prosecutor (1) intentionally misstated the law regarding solicitation (Pet. at

7   57-58), (2) knowingly introduced perjured testimony (Pet. at 58), and (3) removed a defense

8   exhibit from defense table. (Pet. at 59-60.)  Respondent argues the state's denial of the claims

9   was reasonable.  (Answer at 40-42.)

10        Freeman raised this claims for the first time in her petition for review to the California

11   Supreme Court and that court denied the petition without comment or citation.  (Resp't

12   Lodgment Nos. 14, 15.)  Accordingly, this Court must conduct an independent review of the

13   record to determine whether the state court's decision was contrary to, or an unreasonable

14   application of, clearly established Supreme Court law.  *See Himes*, 336 F.3d at 853.

15             ***1.     Clearly Established Law***

16        "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct

17   is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S.

18   209, 219 (1982).  A prosecutor commits misconduct when his or her actions "'so infect. . .

19   the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden*

20   *v. Wainright*, 477 U.S. 169, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

21   643 (1974).)  "Moreover, the appropriate standard of review for such a claim on writ of

22   habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory

23   power.'"  *Id.* (quoting *Donnelly*, 416 U.S. at 642).

24             ***2.     Misstatement of the Law During Closing Argument***

25        Freeman claims the prosecutor misstated the law regarding solicitation during closing

26   argument, by claiming "that 'any evidence corroborating anything related to the case' was

27   sufficient to corroborate the testimony of her one witness to solicitation to [kidnap]."  (*See*

28   Pet. at 57-58, *see also* Traverse at 65-73.)  In her Traverse, Freeman claims solicitation must

1    be corroborated by "a second witness to the solicitation itself or evidence that proves the

2    solicitation such as a recording of the conversation." (Traverse at 66.)  She further asserts the

3    prosecutor improperly argued that Oakley's testimony regarding the solicitation could be

4    corroborated by other testimony provided by Oakley. (*Id.*)

5         First, contrary to Freeman's assertion, California law does not require direct

6    corroborating evidence, such as a recording of the solicitation.  As discussed above in section

7    V(B)(4) of this Report and Recommendation, the corroborative evidence required under

8    California Penal Code section 653f(f) can by "slight" and does not need to establish a fact, in

9    and of itself. *Baskins*, 72 Cal. App. 2d at 731; *Burt*, 45 Cal.2d at 316; *Negra*, 208 Cal. at

10   69.  Rather, it is sufficient if the corroborating evidence merely "tends to connect the

11   defendant with the commission of the crime in such a way as may reasonably satisfy the trier

12   of fact that the witness who must be corroborated is telling the truth." *Rissman*, 154 Cal.

13   App. 2d at 277; *MacEwing*, 45 Cal. 2d at 224.

14   In closing the prosecutor stated:

15       And the judge will indicate to you and has told you that in order to prove
         solicitation, it can be proven by one witness and corroborating circumstances.
16       And it can be the corroborating circumstances in this case.  And here, ladies
         and gentlemen there was overwhelming corroborated [sic] circumstance.
17       [Oakley] said that [Freeman] had the money. There's the money.  She said
         Canada or Mexico.  You'll see the – you'll see some of the things found on her
18       computer. [ ¶] But everything else that Kim Oakley said helps corroborate her
         statement that she was solicited by [Freeman].  I mean, the list goes on and on
19       and on.  And we've talked about a lot of it, all the things that were confirmed,
         the internet, Myrna, the disguises, the pee pan, the spend the day, the rental
20       cars.  Everything totally corroborated what she says.  And you can take that
         into account with the corroboration of the money and the internet, because it's
21       true. It's all true.

22   (Resp't Lodgment No. 2 at 3004-05.)

23        The prosecutor's argument was consistent with California law.  At the outset, she

24   accurately stated that solicitation may be proved by the testimony of one witness and

25   corroborating circumstances.  Cal. Penal Code §653f(f).  Next, her argument was based on

26   reasonable inferences.  During closing argument, a prosecutor is given "wide latitude" to

27   argue all reasonable inferences based on the evidence. *Ceja v. Stewart*, 97 F.3d 1246,

28   1253-54 (9th Cir. 1996); *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  Here,

the prosecutor merely argued that the testimony of Oakley regarding the solicitation charge was sufficiently corroborated by other evidence which was consistent with Oakley's statements.  For instance, she noted that Oakley's statement that Freeman had used disguises and rented several different vehicles in order to stalk the foster family was corroborated by evidence found in the trailer, pursuant to a search warrant – namely two wigs, a receipt for a wig, and receipts from car rental agencies.  (Resp't Lodgment No. 2 at 3005; *see also id.* at 2978-80.)   She also argued Oakley's testimony that Freeman told her she carried large sums of cash in case she had the opportunity to "steal" E. and flee across the Canadian or Mexican border (*id.* at 1755) was corroborated by the fact that Freeman had over $6000 in cash on her person when she was arrested.  (Resp't Lodgment No. 2 at 2982-93.)  These were all reasonable inferences based on the evidence.  Thus, the prosecutor neither misstated the law, nor the evidence.   *Ceja*, 97 F.3d at1253-54.

Freeman appears to argue that the prosecutor misstated the law when she said "But everything else that Kim Oakley said helps corroborate her statement that she was solicited by [Freeman]."  (*See* Traverse at 66-67.)  To the extent this single statement seems contrary to state law, it does not amount to prosecutorial misconduct.  Federal habeas courts must evaluate the comments made during closing argument in light of the trial evidence on the whole in order "to place [the] remarks in context."  *Darden*, 477 U.S. at 179.  "The arguments of counsel are generally accorded less weight by the jury than the court's instructions and must be judged in the context of the entire argument and the instructions."  *Ortiz–Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996).

Here, when taken in context, it appears the prosecutor merely misspoke.  She followed the statement immediately with examples of evidence *other* than Oakley's testimony, which corroborated the solicitation testimony.  Thus, it is unlikely the jury would have understood the statement as a whole to mean that it could consider Oakley's statements as corroborating evidence of her own testimony.  *See Sassounian v. Roe* , 230 F.3d 1097, 1107 (9th Cir. 2000) (prosecutor's isolated improper remarks did not violate petitioner's due process rights, in context of trial as a whole); *see also Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991).

1   Furthermore, the jury was instructed that the attorney's arguments were not evidence; and

2   the jury was properly instructed by the trial judge on the evidence required to support a

3   solicitation conviction.  (Resp't Lodgment No. 1 at 134, 139, 167-68.)  The jurors are

4   presumed to have followed these instructions.  *See Richardson v. Marsh*, 481 U.S. 200, 211

5   (1987).   Thus, the even assuming the prosecutor's statement was improper, it did not render

6   the trial fundamentally unfair.  *Duckett,* 67 F.3d at 743-743 (finding that, even when the

7   prosecutor's comment may have been improper, it was an isolated moment in a lengthy trial,

8   and the jury was instructed that statements of counsel are not evidence).

9        The state court's denial of the claim was neither contrary to, nor an unreasonable

10   application of, clearly established law.  *See Himes*, 336 F.3d at 853.  The Court recommends

11   the claim be DENIED.

12             ***3.    Knowing Presentation of Perjured Testimony***

13        Freeman argues the prosecutor knowingly presented perjured testimony of three

14   witnesses – Diana Gonzalez, Wayne Maxy and Karen Johns.  (Pet. at 58-59; *see also*

15   Traverse at 73-76.)  Clearly established Supreme Court law holds that "[t]he knowing use of

16   perjured testimony by a prosecutor generally requires that the conviction be set aside."

17   *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S.

18   97, 103 (1976).)  "The same result obtains when the State, although not soliciting false

19   evidence, allows it to go uncorrected when it appears."  *Napue v. People of the State of*

20   *Illinois*, 360 U.S. 264, 269 (1959).  However, the presentation of conflicting versions of

21   events, without more, does not constitute knowing presentation of false evidence.  *United*

22   *States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002).  To prevail on such claims, three

23   things are required: (1) the testimony or evidence must be false, (2) the prosecution must

24   have known or should have known it was false, and (3) the false testimony must be material.

25   *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citing *United States v.*

26   *Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).

27        Freeman claims Gonzalez lied when she described the car that followed her and her

28   family during a trip to Los Angeles.  (*See* Traverse at 74.)  She claims prosecutor instructed

-44-

Gonzalez to give this false testimony during a recess in the trial.  Gonzalez took the stand late in the afternoon on October 21, 2004 and was only able to testify for a few minutes before the court recessed for the day.[7]  (Resp't Lodgment No. 2 at 1269.)  As such, Gonzalez was just beginning to describe the Los Angeles freeway incident when the court ended questioning.  The prosecutor's final question was about the car following them:

> Q:     Let me direct your focus now to the time when you got back on the freeway from OSO Parkway up until the Carmenita exit.  At that time were you trying to figure out what kind of car it was or what the person looked like in the car?
>
> A:     Yes, I did.  It was an elevated car. I don't know if it was a minivan or SUV.  It was elevated.  At one point we did have a chance to switch into a lane.  The car that was following us was in the right lane next to us.  I did look over.  I happened to see the person who was driving the vehicle.  I couldn't really make it out.  The person had a disguise on. She was very light-skinned wearing a wig, dark glasses, jacket, and mustache.

(Resp't Lodgment No. 2 at 1273.)  With that answer, the judge concluded testimony.  The next morning, Gonzalez resumed her testimony.  The prosecutor asked Gonzalez if she remembered being interviewed by an investigator in December 2002.  Gonzalez replied that she did and recalled that at that time, she told the investigator that the car following them was a "new model darker, blue, slash, gray color Ford Windstar." (Resp't Lodgment No. 2 at 1405.)  Later in the trial, Wayne Maxey, the investigator who interviewed Gonzalez on December 3, 2002, testified that Gonzalez told him the car that chased them on the Los Angeles freeway was a "new model bluish gray, Ford Windstar."  (*Id.* at 2094.)

Freeman has not established that Gonzalez's testimony was false.  Although she gave a more detailed description of the car on her second day of testimony, there was nothing inconsistent in her testimony.  Even if her statement could be construed as inconsistent, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.*" Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998); *see also United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (no evidence of prosecutorial misconduct

---

[7]   The court even remarked when Gonzalez was first called to the stand, that it was 4:22 p.m. and they would recess at 4:30 p.m.  (Resp't Lodgment No. 2 at 1269.)

where discrepancies in testimony could as easily flow from errors in recollection as from lies).

To the extent Freeman suggests that prosecutor did more that simply refresh her memory regarding her previous statement, this alone does not amount knowing introduction of false testimony.  "Cross-examination and argument are the primary tools for addressing improper witness coaching." See *United States v. Sayakhom*, 186 F.3d 928, 945 (9th Cir. 1999).  Here, during cross-examination defense counsel explored the possibility that Gonzalez's description was based on information she learned from investigators, rather than her own memory, and Gonzalez stated that she did not receive information from law enforcement. (*See* Resp't Lodgment No. 2 at1459-1462.)  Defense counsel also argued in closing that it was only after the foster parents received information about Freeman's actions from authorities, that they determined it was Freeman who had followed them in Los Angeles.  (*Id*. at 3018-19).  Thus, the defense had an opportunity to suggest Gonzalez's identification of the van was based on something other than her independent memory of the incident.

Further, there is no evidence that Wayne Maxey testified falsely.  Freeman appears to claim that because a small portion of Maxey's testimony was inconsistent with Gonzalez's preliminary hearing testimony, he must have fabricated his report.  (Traverse at 74.)  As discussed above, the presentation of conflicting versions of events does not constitute knowing presentation of false evidence.  *Geston*, 299 F.3d at 1135.  Defense counsel questioned Gonzalez about inconsistencies in her preliminary hearing testimony and the account she gave to Maxey.  (Resp't Lodgment No. 1472-76.)  Gonzalez's and Maxey's credibility was an issue for the jury.  *See Zuno-Arce*, 44 F.3d at 1423.

Freeman's claim that the prosecutor suborned perjury by State Farm Insurance manager Karen Johns is also without merit.  The prosecutor called Johns to testify that there was no record Freeman had dropped off paperwork at State Farm on the evening of October 23, 2002, as Freeman had claimed.  (*See* Lodgment No. 2 at 2532.)  Freeman had testified that she never followed Gonzalez on October 23, 2002.  She stated that on the evening of

October 23, she made copies of documents and dropped them off at State Farm office which happened to be located near the foster family's home.  (*Id.*)  After dropping of the papers, Freeman decided to drive by the foster family's apartment.  She drove in and saw the family's car and assumed E. was alright and then drove away.  Shortly after leaving she noticed Gonzalez following her.  (*Id.* at 2532-33.)  Johns testified, however, that according to State Farm logs, Freeman dropped her paperwork off on October 24, 2002.  (*Id.* at 2766.)  As such, the prosecutor argued that Freeman was lying about the events of October 23.  (Resp't Lodgment No. 2 at 2991.)

Aside from her own conclusory allegations, Freeman offers no evidence that Johns gave perjured testimony, or that the prosecutor suborned perjured testimony from Johns. Defense counsel questioned Johns at length about whether the documents could have been delivered after business hours on the evening of October 23, 2002 as Freeman had testified but not received until the next day when the office was open.  It was for the jury to resolve any inconsistencies between Johns's testimony and that of Freeman.  *See Zunc-Arce*, 44 F.3d at 1422-23; *see also United States v. Scheffer*, 523 U.S. 303, 313 (1998) ("A fundamental premise of our criminal trial system is that 'the jury is the lie detector.'")

In sum, Petitioner has not shown that the testimony of Gonzalez, Maxey and Johns testimony was actually false or that the prosecutor knew or should have known that it was false.  *See Zuno-Arce*, 44 F.3d at1423.  Accordingly, this claim for habeas relief fails because the Court finds that the state court's denial of his claim on this issue was objectively reasonable.  *Himes*, 336 F.3d at 853.  The Court recommends the claim be DENIED.

### 4. *Alleged Removal of Documents*

Finally, Freeman's claim that the prosecutor removed an exhibit from defense table is wholly without merit.  When defense counsel was questioning Patricia McCollough, the therapist who worked with Freeman and E. during their reunification process, he attempted to ask McCollough about the contents of a report.  When McCollough looked at the report to refresh her memory, she could not tell if she had written it because the signature page was missing.  (Resp't Lodgment No. 2 at 2438.)  The court sustained the prosecutor's objection to

any further testimony regarding the report because McCollough could not authenticate it. (*Id.* at 2439.)  From this, Freeman concludes the prosecutor must have taken the signature page of the report from defense table.  Petitioner's conclusory, self-serving speculation is insufficient to support a claim of prosecutorial misconduct. " *Darden*, 477 U.S. at 181.  The Court recommends the claim be DENIED.

### D.   Denial of Substitution of Retained Counsel and *Marsden* Motion

Freeman claims her Sixth Amendment right to counsel was violated when the trial court (1) denied her request to substitute retained counsel on the day of trial and (2) denied her *Marsden* motion[8] to have Apgar relieved as counsel.  (Pet. at 57.)  Respondent argues the claims are underdeveloped and without merit.  (Answer at 28, fn.7.)  Freeman raised this claim for the first time in her petition for review to the California Supreme Court, and it was denied without comment.  (Resp't Lodgment Nos. 14, 15.)  Thus, the Court must conduct an independent review to determine whether the denial was contrary to, or an unreasonable application of, clearly established law.  *Himes*, 336 F.3d at 853.

### 1.   Denial of Request to Substitute Retained Counsel

On October 18, 2004, the day the trial was to begin, Freeman requested that Apgar be relieved as counsel and that he be replaced by retained counsel, William Mueller.  (Resp't Lodgment No. 2 at 702.)  Mueller appeared and informed the court that he would need a continuance in order to prepare for trial.  (*Id.* at 719-20.)  The judge found the request to be a delay tactic and it was denied.  (*Id.* at 718-21.)

Under the Sixth Amendment, criminal defendants who have the means to hire their own attorneys generally have a right to such private counsel of their choice.  *See United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006) (Sixth Amendment guarantees defendant right to be represented by qualified attorney whom defendant can afford to hire); *see also Powell v. State of Alabama*, 287 U.S. 45, 53 (1932) ("a defendant should be afforded a fair

---

[8] *People v. Marsden*, 2 Cal.3d 118 (1970) requires the trial court to give "a party an opportunity to present argument or evidence in support of his contention" requesting substitution of counsel in a hearing outside the presence of the jury. This California rule substantially parallels the one prescribed by the Ninth Circuit in *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir.1980).  *See Chavez v. Pulley*, 623 F. Supp. 672, 687 n. 8 (E.D. Cal. 1985).

opportunity to secure counsel of his own choice").  However, "[t]he right to choose one's attorney is not unlimited and, if in the sound discretion of the court, the attempted exercise of choice is deemed dilatory or otherwise subversive of orderly criminal process, the judge may compel a defendant to proceed with designated counsel." *Lofton v. Procunier*, 487 F.2d 434, 435-36 (9th Cir. 1973); *see also United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986) (the right to counsel of choice "must give way where its vindication would create a serious risk of undermining public confidence in the integrity of our legal system").

In general, "[t]rial judges necessarily require a great deal of latitude in scheduling trials." *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 (1983).  In that regard, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589-90 (citations omitted); *see also Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir.  2008); *Morris v. Blackletter*, 525 F.3d 890, 894-98 (9th Cir.  2008).

Here, the judge denied the request for substitution of appointed counsel because it would have required a continuance.  The court reviewed the two year history of the case at length.  He noted that the trial had already been continued numerous times, and that Freeman had been through seven attorneys since the case began.  (Resp't Lodgment No. 716-21.) Freeman's first attorney, Private Conflict's Counsel (PCC) Tom Lavaut, was appointed on December 11, 2002, shortly after her arraignment.  (Resp't Lodgment No. 1 at 525.)  On December 19, 2002, the court granted a *Marsden* motion, relieved Lavaut, and appointed PCC Marcee Chipman.  (*Id.* at 529; *see also* Resp't Lodgment No. 2, vol. 3 at 9.)  On January 6, 2003, two days before the preliminary hearing was to be held, the court granted Freeman's request to have Chipman relieved and substituted retained counsel William Nimmo.  The preliminary hearing was continued to March 27, 2003. (Resp't Lodgment No. 1

-49-

at 531.)  On the day the preliminary hearing was to be held, Freeman made a motion to waive her right to counsel and represent herself, which the court granted.  (*Id*. at 538.)  Nimmo was relieved and Freeman proceed pro per.  The preliminary hearing was continued to May 9, 2003.  (*Id*.)  On April 30, 2003, the trial court denied Freeman's request that the preliminary hearing be continued.  On May 9, 2003, Freeman's pro per status was revoked and PCC Rosalind Feral was appointed.  The preliminary hearing was continued to June 30, 2003. (*Id.* at 541, 544.)  On June 30, Freeman made another *Marsden* motion which the court granted.  PCC Joe Cox was appointed and the preliminary hearing was again continued. (Resp't Lodgment No. 1 at 546-47.)   On September 3, 2003, Cox represented Freeman at her preliminary hearing.  (*Id.* at 550.)

After the hearing, trial date was originally set for November 3, 2003.  After a series of continuances, the date was moved to April 20, 2004.  On April 19, 2004, Freeman made another *Marsden* motion to have Cox relieved as counsel, which the court "reluctantly" granted.  (*Id.* at 559; *see also* Resp't Lodgment No. 2 at 207-08.)  William Apgar was then appointed and the trial date was again continued. (*Id.*)  On May 21, 2004, Freeman made another *Marsden* motion which was denied.  (Resp't Lodgment No. 1 at 569.)  Trial was set for July 19, 2004.  On that date, defense counsel requested a continuance, which the trial court initially denied. The court reconsidered the motion later that day and granted a continuance to October 18, 2004.  On October 18, Freeman requested Mueller be substituted as retained counsel and the trial continued so Mueller could prepare.   (*Id.* at 702, 719.)

Given these facts, the denial of Freeman's request was did not amount to a Sixth Amendment violation.  As the trial court noted, Apgar was Freeman's seventh attorney and there had been numerous continuances as a result of constant substitutions.  The record reflects a pattern of requesting substitution of counsel as a means of delaying the proceedings.  Indeed, Freeman substituted counsel five times before the preliminary hearing was held, and each request to do so came just days before, or the day of, the scheduled hearing.  The pattern appeared to continue as trial approached.  Given these facts, the trial judge's decision to proceed with trial on October 23, 2004 was not "unreasoning or

-50-

arbitrary," particularly since trial had originally been set for November 3, 2003 and by then had been continued for nearly a year. *See Morris*, 461 U.S. at 11–12 (trial court has broad discretion to deny continuance; only unreasoning and arbitrary insistence on starting trial violates right to counsel); *See also Miller*, 525 F.3d at 894–98 (finding habeas relief not warranted where petitioner requested private counsel on morning trial was set to begin); *Houston*, 533 F.3d at 1079.

Thus, the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Himes*, 336 F.3d at 853. The Court recommends it be DENIED.

### 2.   *Denial of Marsden Motion*

Immediately after the trial judge denied Freeman's request to substitute Mueller as retained counsel, she made a *Marsden* motion to have Apgar relieved and new counsel appointed. She claims the denial of the motion violated her right to counsel. (Pet. at 57.) A criminal defendant who cannot afford to retain counsel has no right to counsel of his own choosing. *Wheat v. United States*, 486 U.S. 153, 159 (1988). Nor is he entitled to an attorney that he likes and feels comfortable with him. *United States v. Schaff*, 948 F.2d 501, 505 (9th Cir.1991). Nevertheless, to compel a criminal defendant to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict violates his Sixth Amendment right to counsel. *Daniels v. Woodford*, 428 F.3d 1181, 1197–98 (9th Cir. 2005).

The inquiry in a federal habeas proceeding is whether the trial court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek*, 218 F.3d 1017, 1024-25 (9th Cir.2000) (en banc). The Court, therefore, must assess "the nature and extent of the conflict and whether that conflict deprived the defendant of representation guaranteed by the Sixth Amendment." *Daniels*, 428 F.3d at 1197 (quoting

1  *Schell*, 218 F.3d at 1027).

2       In accord with the dictates of the Sixth Amendment and *Marsden*, the trial court

3  inquired into Freeman's concerns.  *See Hudson v. Rushen*, 686 F.2d 826, 831 (9th Cir.1982)

4  (state court conducted adequate hearing when it invited defendant to make a statement and

5  listened to defendant's reasons for wanting new counsel).  During the hearing, Freeman

6  complained that Apgar was not prepared for trial, and not adequately communicating with her.

7  (Resp't Lodgment No. 2, at 722-24.)  She also claimed that he had not subpoenaed any

8  witnesses and had not thoroughly interviewed witnesses.  (*Id.* at 724, 729.)  She stated, in

9  part: "He has not interviewed my witnesses.  He has no idea what they can say.  He doesn't

10  listen to me when I try to tell him.  He calls them up and doesn't ask them the right questions.

11  . . He doesn't read what I send him when I write him letters.  He doesn't take my phone calls. .

12  . ."  (*Id.* at 729-30.)

13       For his part, Apgar stated that he was prepared for trial, that his investigator had

14  spoken to witnesses, and that since being appointed in the case he had not accepted any new

15  cases so that he could devote his time entirely to Freeman's case.  (*Id.* at 732.)  With regard to

16  communication, Apgar stated that on a recent occasion, he and his investigator had gone to

17  see Freeman in jail, only to find that she had bailed out two days before without telling him.

18  (*Id.* at 733.)  When he did reach her by phone, she hung up on him.  (*Id.* at 733.)  After that,

19  he stated:

20           Ms. Freeman did call and leave a message about her clothes, and I did
          personally – she wanted to pick up her clothes and I personally talk with her.  I
21       said, "Well if you are going to pick up your clothes, I'd like to talk to you about
          the case."  She said, "Well, if I have time, I'll think about it."  She didn't get
22       back to me."  The other was a phone call from her on my machine, I returned
          the call, and I didn't get her.  I just got her voicemail, and I haven't – there has
23       been no calls from her, no communication since she's been out of custody.  I left
          a message, as the court said, there was going to be a hearing at 10:30.  I haven't
24       heard from Ms. Freeman one way or another on that."

25  (*Id.*)

26  / / /

27       The Court then inquired whether Apgar was indeed prepared for trial and he

28  responded:  "I've had to be ready, your Honor.  I'm certain I'm not ready as far as Ms.

1  Freeman is concerned – obviously, we have different viewpoints on what's important, what's

2  cumulative, things like that."  (*Id.* at 734-35.)

3        In denying Freeman's motion, the trial court stated:

4            To the extent there are conflicts between the statements made during this hearing, I believe Mr. Apgar.  I believe him for the following reasons: Mr.

5      Apgar was appointed on this case through the PCC.  He's made the court appearances.  We have had extensive hearings in this case.  Mr. Apgar has more

6      than adequately represented Ms. Freeman's interests in all those hearing.

7  (*Id.* at 740-41).

8      After a brief recess, the judge continued:

9            I have already indicated for the record the quality of representation the court has observed.

10

11            Prior proclivity to substitute counsel.  Ms. Freeman you are now on your eighth attorney in this case.  The case has been going on for almost two years,

12      and I will note that as one of those eight at one point in time you were representing yourself.

13            The next item I have to consider is the reason for the request.  The court perceives the reason for the request as nothing but a delaying tactic as today is

14      the date of trial in this case.   The length of proceedings as considered by the court.  This case has been going on since 2002.  The case is almost two years

15      old.  There have been numerous continuances, opposed by the People, and have been granted to facilitate Ms. Freeman.  Today is the date of trial.

16

17            The next issue I have to consider is the obstruction or delay which might reasonably be expected to follow the granting of the motion.  The court will not

18      grant the motion.  I've already stated my reasons why. . . Accordingly, the motion is denied.

19  (*Id.* at 742-43.)

20        The trial court's finding Apgar had adequately represented Freeman's interests up to

21  that point was reasonably drawn from the record.  *See* 28 U.S.C. § 2254(d)(2).  Apgar

22  represented Freeman in several pre-trial hearings and, contrary to Freeman's assertion, it was

23  clear he was familiar with the facts of the case.  Freeman was extremely demanding of

24  attorneys and refused to yield on matters of trial strategy if she disagreed with it.  Freeman's

25  unwillingness to let her lawyer make tactical determinations is not a legitimate reason to

26  compel appointment of new counsel.  *See Schell*, 218 F.3d at 1026 & n. 8.  Given the history

27  in this case, particularly the fact that Apgar was Freeman's seventh attorney, there was no

28  reason at all to expect that the same problems would not arise again with new counsel.

-53-

1  It was therefore reasonable for the trial court to conclude that there was no inadequate

2  representation and no conflict other than the one that was being created by Petitioner.  *See*

3  *United States v. Franklin*, 321 F.3d 1231, 1238-39 (9th Cir. 2003) (defendant failed to show

4  "extensive conflict" with counsel although he claimed that counsel failed to investigate, never

5  responded to defendant's questions, and failed to act on information provided by defendant).

6  Finally, as discussed above, Freeman made her motion for substitution on the day trial was set

7  to begin and if granted, would have required yet another continuance.  "It is within the trial

8  judge's discretion to deny a motion to substitute made during or on the eve of trial if the

9  substitution would require a continuance."  *See United States v. McClendon*, 782 F.2d 785,

10  789 (9th Cir. 1986).

11      The trial court's denial of Freeman's October 18, 2004 *Marsden* motion did not

12  constitute constitutional error. As such, the state court's denial of the claim was neither

13  contrary to, nor an unreasonable application of, clearly established law.  *See Himes*, 336 F.3d

14  at 853.    The Court recommends the claim be DENIED.

15          **E.       Ineffective Assistance of Trial Counsel**

16      In her petition, Freeman raises several claims of ineffective assistance of trial counsel.

17  Although many of these claims are contained under Freeman's first ground for relief (related

18  to judicial bias) there are several others which appear throughout the Petition.  For

19  organizational purposes, the Court has grouped the claims based on the legal basis for them,

20  as opposed to where the appear in the Petition.  Respondent addresses many but not all of

21  Freeman's claims, arguing that the state court's denial was neither contrary to, nor an

22  unreasonable application of, clearly established law.  (Answer at 26-29.)   Freeman raised her

23  claims in her petition for review to the California Supreme Court, which was denied without

24  comment.  Because there is no reasoned decision to which this Court may defer, it must

25  conduct an independent review of the record to determine whether the denial was contrary to,

26  or an unreasonable application of, clearly established law.  *See Himes*, 336 F.3d at 853.

27          **1.     *Clearly Established Law***

28      To prevail on a claim of ineffective assistance of trial counsel in federal court, Freeman

-54-

1  must first establish that his trial counsel's performance fell below an objective standard of

2  reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "This requires a

3  showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

4  guaranteed the defendant by the Sixth Amendment."  *Id.*  Judicial scrutiny of counsel's

5  performance must be "highly deferential."  *Id.* at 689.  Second, she must show counsel's

6  deficient performance prejudiced the defense.  Under *Strickland*, there must be a "reasonable

7  probability that, but for counsel's unprofessional errors, the result of the proceeding would

8  have been different."  *Strickland*, 466 U.S. at 694-95.  A reasonable probability is a

9  probability "sufficient to undermine confidence in the outcome."  *Id.* at 694-95; *see also*

10  *Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).

11     A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance

12  of counsel claims under § 2254.  *See Richter*, 131 S.Ct. at 788; *Premo v. Moore*, 562 U.S. –,

13  131 S.Ct. 733, 740 (2011) (same).  On federal habeas review, "the question is not whether

14  counsel's actions were reasonable, [but] whether there is any reasonable argument that

15  counsel satisfied *Strickland's* deferential standard."  *Richter*, 131 S.Ct. at 788.  The Court

16  need not address the performance prong if the claim can be resolved on the ground of lack of

17  sufficient prejudice.  *Strickland*, 466 U.S. at 697.

18              **2.    *Claims Related to Judicial Bias***

19     Freeman claims defense counsel was ineffective in failing to challenge Judge O'Neill

20  for bias.  She claim he also should have filed a writ of mandate to the court of appeal after

21  Judge O'Neill was reinstated.[9]  (*See* Pet. at 41, 48.)

22     Freeman has not shown defense counsel was deficient in electing not to challenge

23  Judge O'Neill.  As discussed above, after the rumors regarding Freeman's alleged stalking of

24  Judge Elias proved unfounded, Judge Deddeh determined that there was no longer any reason

25  for the bench to be recused from hearing Freeman's case and sent the case back to Judge

26  O'Neill.  Although Freeman initially challenged O'Neill as biased, she withdrew that

27

28
_____

[9] The facts related to this claim were summarized by the California Supreme Court, and are included in section V(A)(2)(a) of this Report and Recommendation.

challenge on the record before Judge Deddeh.  (Resp't Lodgment No. 2, vol. 1 at 1; *see also*
Resp't Lodgment No. 1 at 567.)  Apgar would have little reason to pursue a writ after
Freeman withdrew her challenge.  Furthermore, Apgar did not join Freeman's challenge
because, as Freeman later admitted, it was his opinion that Judge O'Neill was a "decent
judge" and they risked drawing a less sympathetic judge if Judge O'Neill withdrew.  (*See*
Resp't Lodgment No. 2 at 727.)  Although she withdrew her challenge, months later, on or
October 18, 2004, after the court denied her *Marsden* hearing and it became clear the trial
would proceed that day, Freeman stated that had disagreed with Apgar's decision not to
challenge O'Neill.  (*Id.*)  Tactical decisions, however, are "committed to the judgment of the
attorney and not the client."  *Schell v. Witek*, 218 F.3d 1017, 1026 and n.8 (9th Cir. 2000) ( en
banc ) (further noting that "'[A] lawyer may properly make a tactical determination of how to
run a trial even in the face of his client's incomprehension or even explicit disapproval,'"
quoting *Brookhart v. Janis*, 384 U.S. 1, 8, 86 S.Ct. 1245 (1966)); *see also United States v.
Corona-Garcia*, 210 F.3d 973, 977 n.2 (9th Cir. 2000) ("trial tactics are clearly within the
realm of powers committed to the discretion of defense counsel"); *United States v.
Wadsworth*, 830 F.3d 1500, 1509 (9th Cir.1987) ("appointed counsel, and not his client, is in
charge of the choice of trial tactics and the theory of defense")  Accordingly, it was not
unreasonable for Apgar to elect not to challenge Judge O'Neill or file a writ of mandate with
the California Court of Appeal seeking his recusal.  *See Richter*, 131 S.Ct. at 788.

     The denial of this claim was neither contrary to, nor an unreasonable application of,
clearly established federal law.  *See Himes*, 336 F.3d at 853. The Court recommends the claim
be DENIED.

### 3.    *Failure to Object and/or File Motions*

     Freeman argues defense counsel was ineffective for failing to file a writ to challenge
the denial of his motion to set aside the indictment, pursuant to California Penal Code section
995.  (Pet. at 48.)  Freeman's previous defense counsel, Joe Cox, had filed a lengthy, detailed
motion to set aside the indictment on March 23, 2004, before Apgar was appointed to replace
him on April 19, 2004.  (Resp't Lodgment No. 1 at 04-55; *see also* Resp't Lodgment No. 2 at

201-11.)  Apgar filed a supplemental motion to strike the indictment on May 3, 2004 and on May 13, 2004 the trial court denied the motion.[10]  (Resp't Lodgment No. 1 at 560.)  The next day, Apgar appeared before Judge Deddeh and stated on the record that Freeman wanted him (Apgar) to file a writ with the appellate court, challenging the denial of the § 995 motion. Apgar stated that "I checked with [Private Conflicts Counsel] and they would not give me authority to do [so]."  (Resp't Lodgment No. 2 at 302-303.)  Freeman claims Apgar's office refused to approve funding for the appeal.  (*See* Pet. at 48.)

Counsel's decision was neither deficient performance nor prejudicial.  "Failure to make a futile motion does not constitute ineffective assistance of counsel."  *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994).  Freeman offers nothing but her own speculation that an appeal might have been successful.  Under California Penal Code section 995, an indictment may be set aside only when there is a total absence of evidence to support a necessary element of the offense charged.  *People v. Superior Court (Jurado)*, 4 Cal. App. 4th 1217, 1226 (1992).  On appeal of a denial of such a motion, the standard is the same.  *See id.*  A review of the preliminary hearing transcript reveals that Gonzalez, Franco and Oakley provided testimony regarding Freeman's stalking, solicitation and burglary charges.  Law enforcement officers testified about E.'s 911 call reporting that her mother had abused her, E.'s injuries, the condition of the trailer and items found in the trailer, including photos of the foster family, lists of items to buy including wigs and disguises, and rental car receipts for cars matching the description of those reported following the foster family.  (*See generally*, Pet. at Ex. 7, Transcript of Preliminary Hearing (ECF. No 1-4, 1-5.)  Given the evidence presented at the hearing, the decision not to pursue an fruitless appeal, whether it was Apgar's or his

/ / /

/ / /

supervisors' at Private Conflicts Counsel, was reasonable.  *See Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (stating that "a lawyer's zeal on behalf of his client does not require him

---

[10] The motion was denied by Retired Superior Court Judge Richard Montes.  (Resp't Lodgment No. 1 at 560.)

1  to file a motion which he knows to be meritless").

2    In a similar claim, Freeman contends defense counsel was ineffective in failing to join

3  her motion for change of venue.  (Pet. at 50.)  She contends Apgar argued "against" her

4  motion to have the case transferred.  (*Id.*)  At the May 14, 2004 hearing before Judge Deddah,

5  Apgar informed the court that Freeman has asked him to request that the case be transferred to

6  another district and he had told her that his office had not approved his filing such a motion.

7  Judge Deddan stated that he saw "no basis for a change of venue motion" but noted that a

8  formal motion, if filed, could be heard by the judge that would be assigned to the case.

9  (Resp't Lodgment No. 2 at 302, 308.)

10    Freeman has not shown trial counsel's decision not to make a change of venue motion

11  was unreasonable, nor that his failure to do so prejudiced her.  "The standards governing a

12  change of venue ultimately derive from the due process clause of the fourteenth amendment

13  which safeguards a defendant's [S]ixth [A]mendment right to be tried by 'a panel of impartial,

14  'indifferent' jurors.' "*Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.1988) (quoting *Irvin v.*

15  *Dowd*, 366 U.S. 717, 722 (1961)).  If the trial court is unable to seat an impartial jury owing to

16  "prejudicial pretrial publicity or an inflamed community atmosphere," due process requires

17  that the trial court grant defendant's motion for a change of venue.  *Id.*, (quoting *Rideau v.*

18  *Louisana*, 373 U.S. 723, 726 (1963)).

19    Here, there is no evidence in the record or alleged in the Petition that indicates there

20  would be difficulty seating an impartial jury.  Indeed the judge had already expressed doubt

21  that such a motion would be appropriate.  Counsel need not file motions that are likely to lose,

22  because doing so may cost the defendant "some of his lawyer's credibility with the judge."

23  *Lowry*, 21 F.3d 344, 346 (9th Cir. 1994).  In short, Freeman has not shown deficient

24  performance or prejudice.

25    Freeman states she filed a motion for change of venue on her own behalf and attaches

26  an unsigned copy of the motion to her Petition.  (Pet. at Ex. 7, ECF No. 1-10 at 7-12.)  She

27  claims Apgar's should have "joined" her motion.  (Pet. at 50.)  Although there is no copy of

28  such a motion contained in the Clerk's Transcript, assuming it was filed, it does not alter this

Court's analysis regarding defense counsel's performance. Differences of opinion between the criminal defendant and their trial attorney with regards to trial tactics does not by itself constitute ineffective assistance. *See United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981); *see also Richter*, 131 S.Ct. at 789 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.).

Freeman claims counsel was ineffective in failing to request bail review and failing to adequately argue that her bail should not be increased. (Pet. at 51-52.) On July 20, 2004, a bail hearing was held. The court found a "change in circumstances" based on evidence that Freeman had been in another physical altercation with E. The trial court increased bail to $500,000 and ordered Freeman to have "no contact" with E. or any other potential witnesses. (*See* Resp't Lodgment No. 2 at 716-17.) Contrary to Freeman's claim, evidence was presented on her behalf at the hearing. The record reflects that three photographs of Freeman's arm, listed as defense exhibits A, B, and C, were introduced. (Resp't Lodgment No. 1 at 217.) Freeman also testified on her own behalf. (Resp't Lodgment No. 1 at 574; *see also* Resp't Lodgment No. 2 at 716-17.) On October 14, 2004, the prosecutor again requested bail review because Freeman had allegedly violated the no contact order. Freeman did not appear for the hearing. Defense counsel objected to the hearing proceeding without his client. (Resp't Lodgment No. 1 at 575 ; *see also* Lodgment No. 2 at 717-18.) The court nonetheless heard evidence and concluded that Freeman had again violated the no contact order and issued a bench warrant for Freeman. (Resp't Lodgment No. 1 at 575.) There is nothing in the record to support Freeman's claim that defense counsel failed adequately represent her at either bail hearing. Apgar presented evidence at the hearing July 20, 2004 and objected to evidence being presented at the October 14, 2004 hearing. Freeman has not shown defense counsel's performance was deficient. *See Richter*, 131 S.Ct. at 788.

Next, Freeman argues counsel was ineffective in failing to challenge a probation report that purportedly contained misstatements. (Pet. at 61.) Again, Petitioner's claim is belied by the record. On April 18, 2005, defense counsel filed a second supplemental statement in

1   mitigation, in which he asserted that several statements in the probation report were inaccurate

2   and asked the court to strike those portions.  (Resp't Lodgment No. 1 at 385-387.)  The court

3   considered the motion on April 27, 2004 and it was denied.  (Resp't Lodgment No. 2 at 3096-

4   97.)

5          Freeman appears to claim that defense counsel should have challenged additional

6   portions of the probation report.  Freeman filed her own 80 page motion to strike portions of

7   the report along with Apgar's.  (Resp't Lodgment No. 1 at 419-509.)  At the sentencing

8   hearing, Apgar stated:

9          Your honor, there are actually two documents.  There's the one that I filed and
           there's one that, although it has my name on it, it was actually presented by my
10         client.  And I've discussed with her and she feels as though her statement is
           accurate as to the matters that should be deleted. . . Mine was, of course, shorter
11         and simply designated certain paragraphs that I believed were not presented at
           trial itself and would be prejudicial as far as the court making its determination.

12

13  (Resp't Ldogment No. 2 at 3096.)

14         The judge considered Apgar's and Freeman's motions and denied them both.  (*Id.*)

15  Even assuming he should have raised additional issues, the trial court stated that it considered

16  Freeman's motion as well as Apgar's and it denied both.  As discussed above, there is no

17  obligation to raise a meritless argument on a client's behalf.  *James*, 24 F.3d at 27.  Even if the

18  Court were to assume for the sake of argument that there were additional issues that could

19  have been raised, a defendant "does not have a constitutional right to compel appointed

20  counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

21  professional judgment, decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745,

22  751 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  *Id*.

23  Otherwise, the ability of counsel to present the client's case in accord with counsel's

24  professional evaluation would be "seriously undermined."  *Id*.; *see also Smith v. Stewart*, 140

25  F.3d 1263, 1274 n. 4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs"

26  because it "is not necessary, and is not even particularly good appellate advocacy.")  Thus,

27  Freeman has failed to show counsel's performance was deficient or that she was prejudiced.

28  *See Strickland*, 466 U.S. at 687-88.

1  / / /

2  ### 4.   Failure to Call Defense Witnesses and Present Favorable

3  ### Evidence

4  Freeman argues trial counsel was ineffective in failing to call certain witnesses for the

5  defense and failing to introduce favorable evidence.  Namely, she claims counsel should have

6  called Dr. Kenneth Khoury and social worker Kelli Brown to testify.  (Pet. at 68, 78.)  She

7  also argues Apgar should have presented evidence or testimony regarding E.'s mental history.

8  (Pet. at 78-79.)

9  Defense counsel initially sought to present the testimony of Dr. Khoury for the defense

10 at trial, and the trial court held a hearing pursuant to California Evidence Code § 402 to

11 determine its admissibility on July 14, 2004.  Dr. Khoury was a psychiatrist who began

12 treating E. in May 2003, and was still treating her at the time of the hearing.  (*See* Pet., Ex. 8,

13 ECF No. 1–12 at 6-8.)  Dr. Khoury had prepared a brief report in which he stated that it was

14 his opinion that E. had suffered a "brief psychotic episode having delusions and a dissociative

15 state resulting in unfounded accusations toward her mother of physical abuse."  (Pet., Ex. 8,

16 ECF No. 1-11 at 23-24.)  He testified at the 402 hearing that he believed E.'s claims that her

17 mother had physically assaulted her on September 10, 2002, were untrue.  (Pet., Ex. 8, ECF

18 No. 1-12 at 11-12.)  At the end of the hearing, the trial judge ruled that Dr. Khoury's

19 testimony was admissible.  (*Id.* at 110-11.)

20 At trial, defense counsel elected not to call Dr. Khoury as a witness.  In light of Dr.

21 Khoury's testimony upon cross-examination at the 402 hearing, defense counsel's decision

22 was more than reasonable.  The Ninth Circuit has recognized that "[f]ew decisions a lawyer

23 makes draw so heavily on professional judgment as whether or not to proffer a witness at

24 trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir.1999); *see also Duncan v. Ornoski*, 528

25 F.3d 1222, 1234 (9th Cir. 2008) ("'[S]trategic choices made after thorough investigation of

26 law and facts relevant to plausible options are virtually unchallengeable.'") (quoting

27 *Strickland*, 466 U.S. at 690).  At the hearing, Dr. Khoury admitted that he formed his opinion

28 about E.'s actions on September 10, based only on information he received from E. and

reports and letters that were provided him by Freeman.  (*Id.* at 18.)  The prosecutor presented

Dr. Khoury with numerous reports, letter, emails and other documents which documented E.'s

abuse and were consistent with E.'s initial report of abuse that he had not reviewed in forming

his opinion.  (*Id.* at 39-40, 45-46, 50, 57, 63-65, 68, 74.)  Although he did not alter his opinion

about E.'s report of abuse, calling Dr. Khoury as a witness would have opened the door to the

admission of a great deal of impeachment evidence that would have been extremely damaging

to the defense, including several prior reports made to Child Protective Services that Freeman

had abused E. on other occasions.  It was not ineffective for defense counsel to conclude the

potential harm of calling Dr. Khoury outweighed any benefit.[11]  Defense counsel's decision

was reasonable.  *See Brodit v. Cambra*, 350 F.3d 985, 994 & n. 3 (9th Cir. 2003) (holding

state court reasonably concluded trial attorney provided effective assistance where attorney

declined to present evidence favorable to defense out of concern it would open the door to

unfavorable evidence)).

Next, Freeman appears to argue that defense counsel was ineffective in "agreeing" to

let reports of Kelli Brown into evidence, without calling Ms. Brown to testify.  (Pet. at 68.)

Freeman does not, however, point to any specific piece of evidence that was improperly

admitted.  Indeed, this Court can find no reference to any report from Kelli Brown on the list

of exhibits admitted at trial.  Although it is not entirely clear from the testimony, it appears a

report written by E.'s social worker was shown to Freeman during cross-examination.  (*See*

Resp't Lodgment No. 2 at 2596-97.)  The author of the report is not mentioned during the

testimony, but it was presumably written by Brown, who was E.'s social worker at the time.

Attached to the report's addendum were letters written by Franco and Gonzalez and E.,

describing the October 19, 2003 incident.  These letters were admitted into evidence.  (*See*

Resp't Lodgment No. 1 at 224, *see also* Resp't Lodgment No. 2 at 2599.)  The report of the

social worker, however, was not introduced as evidence.  Thus, Freeman's claim that Apgar

---

[11]   In addition, evidence was presented at trial that on July 16, 2004, two days after the evidentiary hearing, Freeman took E. to see Dr. Khoury after a physical altercation occurred between the two, during which E. reported Freeman had grabbed E. by the hair.  Freeman admitted on cross-examination that Dr. Khoury had called CPS as a result, and would not allow E. to leave with her.  (Resp't Lodgment No. 2 at 2587, 2591.)  Freeman fired Dr. Khoury that same day.  (*Id.*)

1   should have objected to introduction of the report is meritless.  *See James*, 24 F.3d at 27.

2          In addition, Freeman has not shown that had Brown been called to testify, the outcome

3   would have been different.  In her Petition, Freeman claims if Brown had testified, she would

4   have stated that she did not properly investigate E.'s allegations and that she had "apologized

5   [to Freeman] and changed her mind about the case."  (Pet. at 67-68.)  Petitioner has provided

6   no evidence to support her claims as to how Brown would have testified.  As such, Freeman

7   cannot establish prejudice.  *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (no

8   ineffective assistance where petitioner did "nothing more than speculate that, if interviewed,"

9   a witness might have given helpful information).  Thus she is not entitled to relief as to this

10  claim.

11         Finally, Petitioner makes a general claim that defense counsel was ineffective for

12  failing to call witnesses to testify about E.'s purported mental illness and alleged bulimia.

13  (Pet. at 78-79.)  Freeman's claim is without merit.  First, she fails to point to any specific

14  witness that Apgar could have, but did not, call to testify.  Defense counsel attempted to

15  present witnesses to testify about E.'s medical history but the evidence was deemed

16  inadmissible.  For instance, Freeman attaches reports of a psychologist, Nancy Gamble, who

17  treated E. in 1996 and diagnosed her with Post Traumatic Stress Disorder.  Apgar sought to

18  have Gamble testify at trial, but the judge ruled her testimony irrelevant and thus inadmissible

19  because she had not treated E.'s since 1996 and therefore could only testify as to her condition

20  six years before the alleged incident.  (Resp't Lodgment No. 2 at 466-68.)  Freeman has

21  therefore failed to show defense counsel's performance was deficient.

22         In addition, Freeman has not shown prejudice.  Even assuming additional evidence

23  regarding E.'s mental health history was admitted, there is nothing to suggest that it would

24  have changed the outcome of the trial.  E. already testified that she had falsely reported the

25  abuse (*id.* at 2140) and evidence that E. had been diagnosed with post traumatic stress

26  disorder was introduced through several other witnesses.  (*See id.* at 2415.)  Freeman fails to

27  explain how evidence showing E.'s purportedly suffered from bulimia would have changed

28  the outcome.  Accordingly, she can show neither deficient performance, nor prejudice.  *See*

1 | *Strickland*, 466 U.S. at 687-88.

2 |        **5.     Failure to Adequately Question Witnesses**

3 |        Petitioner argues defense counsel failed to adequately question and cross-examine

4 | witnesses.  First, she claims Apgar should have questioned her more thoroughly.  (Pet. at 56.)

5 | She states "he only asked her five to ten percent of the questions Petitioner gave him [to ask

6 | her].  He asked the questions out of order and did not make any sense."  She states she told

7 | him to finish asking the "numerous pages of questions" she had given him on re-direct and

8 | when he attempted to, the prosecutor objected, and the judge ruled the questions beyond the

9 | scope of cross-examination.  (*Id.* at 56.)

10 |        As with many of her claims, Petitioner again fails to allege specific facts to support her

11 | allegations.  She merely argues that defense counsel should have asked more questions.  She

12 | does not point to any specific questions Apgar should have, but did not, ask.  Nor does she

13 | explain how his failure to do so prejudiced her.  *See Jackson v. Calderon*, 211 F.3d 1148,

14 | 1155 (9th Cir. 2000) (finding unsupported speculation and conclusory allegations as to an

15 | attorney's substandard performance are not sufficient to show either deficient performance or

16 | prejudice); *James*, 27 F. 3d at 26.  It is for defense counsel, not Petitioner, to make strategic

17 | decisions concerning the questioning of witnesses.  *Duncan*, 528 F.3d at 1234.  Thus,

18 | Freeman has not shown trial counsel was ineffective in questioning her.[12]

19 |        Second, Freeman argues defense counsel failed to adequately impeach Kimberly

20 | Oakley.  (Pet. at 79.)  She states that "she gave Mr. Apgar proof that Kimberly Oakley was a

21 | habitual liar."  She alleges that Oakley lied to authorities because she was angry that Freeman

22 | did not return $1600 to her.  She also claims that Oakley had possibly cheated on her taxes,

23 | and speculates that Oakley might not have actually been married at the time she sought a

24 | divorce.  (*Id.*)  Petitioner, however, provides no specific allegations as to what defense

25 |

26 | _____

27 |        [12] In addition, a review of the record reveals that Apgar did as thorough job questioning Freeman
as was possible under the circumstances.  He attempted to keep her focused on the relevant issues.

28 | Nonetheless, despite warnings from the court, Freeman volunteered information on several occasions
that was either inadmissible or opened the door to unfavorable evidence.  (*See e.g.* Resp't Lodgment No.
2 at 2647.)  Apgar therefore had good reason to keep his questioning of Freeman as brief as possible,
while still allowing her to testify as to her version of events.

1   counsel should have done, but did not.  Apgar did question Oakley about the $1600 on cross-

2   examination.  (Resp't Lodgment No. 2 at 1821-22.)  Freeman's unsupported speculation about

3   Oakley's marital and financial status can hardly support a claim that counsel was deficient for

4   failing to question her on those matters.  *See Bragg*, 242 F.3d at 1088.

5        In addition, this Court has thoroughly reviewed the record and finds that defense

6   counsel questioned Oakley at length about inconsistencies between her trial testimony and

7   previous statements.  (*See* Resp't Lodgment No. 2 at 1820, 1829-32.)  He pressed Oakley on

8   her motivation for reporting Freeman.  (*See id.* at 1822.)  He attempted to show that Oakley

9   may have learned the details of the charges by reading the case file, and not from any

10  purported statements Freeman made to her.  (*Id.* at 1822-24.)  Freeman has failed to show

11  defense counsel's performance was deficient or that she was prejudiced.  *Duncan*, 528 F.3d at

12  1234.

13               **6.    Failure to Investigate and Prepare for Trial**

14       Finally, Freeman makes several general claims that defense counsel was inadequately

15  prepared to try her case.  She claims he "never read the case file, never read the discovery,

16  never discussed the case with Appellant, never interviewed witnesses, did not subpoena

17  witnesses for trial and never prepared the least bit for trial."  (Pet. at 51.)  She repeats these

18  vague claims a several times in her Petition and Traverse.  (*See* Pet. at 57, 77; Traverse at 48.)

19       Here, contrary to Freeman's claim, the record reveals that defense counsel was

20  well-informed of his client's case, that he ably argued his client's defense, and that he

21  competently examined the witnesses.  *See Eggleston v. United States*, 798 F.2d 374, 376 (9th

22  Cir. 1986) (concluding that when the record shows that the lawyer was well-informed, and the

23  defendant failed to state what additional information would be gained by further investigation

24  she claimed was necessary, an ineffective assistance claim fails).  Other than the issues

25  discussed above, Freeman has failed to point to any specific examples demonstrating his

26  counsel's lack of preparation.  Freeman's conclusory allegations that trial counsel failed to

27  investigate or prepare are insufficient to show either deficient performance or prejudice.  *See*

28  *Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000) (finding unsupported speculation

and conclusory allegations as to an attorney's substandard performance are not sufficient to show either deficient performance or prejudice); *James*, 27 F. 3d at 26. Thus, Freeman is not entitled to relief. *See Himes*, 336 F.3d at 853.

### 7. Conclusion

Based on the foregoing, the Court finds the state court's denial of Freeman's ineffective assistance of counsel claims was neither contrary to, nor an unreasonable application of, clearly established law. *See Himes*, 336 F.3d at 853. The Court recommends the claims be DENIED.

### F. Ineffective Assistance of Appellate Counsel

Freeman claims she received ineffective assistance of appellate counsel, in violation of her Sixth Amendment rights. She claims her appellate attorney failed to adequately argue her judicial bias claims, refused to file a petition for review of the February 2007 appellate decision, failed to argue that a second witness or corroboration was required to prove solicitation, and failed to raise the issue of ineffective assistance of counsel on appeal. (*See* Pet. at 31-33, 40-41, 48-49, 57, *see also* Traverse at 50-51.) Respondent addresses some of Freeman's claims, but not all, and argues the state court's denial of them was not unreasonable. (Answer at 29-30.)

### 1. Clearly Established Law

It is clearly established that "[t]he proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*." *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)). A petitioner must first show that his appellate counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Specifically, Freeman must show that counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith*, 528 U.S. at 285. She must then show she was prejudiced by counsel's errors. *Strickland*, 466 U.S. at 694. To establish prejudice, Freeman must demonstrate that she would have prevailed on appeal absent counsel's errors. *Smith*, 528 U.S. at 285.

The Ninth Circuit has observed that:

[Strickland's] two prongs partially overlap when evaluating the performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason-because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989).

### 2. Judicial Bias

Freeman raised the issue of appellate counsel's failure to adequately argue judicial bias on appeal in her petition for review to the California Supreme Court, and it was denied without comment.  (Resp't Lodgment Nos. 14, 15.)  Thus, this Court defers to the last reasoned decision addressing her claim,  that of the California Court of Appeal.  *Ylst*, 501 U.S. at 801-06.  In denying relief, the court stated:

After the appellate briefing in this case was completed, Freeman filed an in pro. per. petition for writ of habeas corpus alleging that appellate counsel incompetently argued the judicial bias issue on appeal.

To demonstrate ineffective representation, the defendant must establish (1) that counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability that, but for counsel's errors, the result would have been more favorable to the defendant.  (*In re Alvernaz* (1992) 2 Cal.4th 924, 936-937, 8 Cal.Rptr.2d 713, 830 P.2d 747.)  If the defendant does not carry his or her burden to show prejudice, a court may reject the incompetency claim without determining whether counsel's performance was deficient.  (*Id.* at p. 945, 8 Cal.Rptr.2d 713, 830 P.2d 747.)

Freeman asserts her appellate counsel was ineffective because he failed to raise the issue that the entire San Diego County Superior Court bench had been recused from her case.  The facts underlying the "recusal" of the entire San Diego County bench are set forth in the California Supreme Court's opinion in this case (*People v. Freeman, supra*, 47 Cal.4th at pp. 997-999, 103 Cal.Rptr.3d 723, 222 P.3d 177), and we need not reiterate them in any detail here. [Footnote 13:  Although we know of no procedure that allows an entire bench to be recused en masse as opposed to individual recusal by each judge, we recognize that such a broad recusal may be the practical effect of a decision by a presiding or supervising judge to assign the case to a retired or out-of-county judge.]  Briefly, Judge Robert O'Neill and the entire San Diego County Superior Court bench were originally recused because of allegations that Freeman had stalked a San Diego County Superior Court judge who was Judge O'Neill's friend.  After these stalking allegations were assessed to be unfounded, Judge O'Neill was reassigned to the case and presided over the trial.  (*Id.* at pp. 997-998, 103 Cal.Rptr.3d 723, 222 P.3d 177.)

On review before the California Supreme Court, the court held that Freeman had forfeited a statutory judicial disqualification claim by failing to utilize the required writ procedure, and that Judge O'Neill's reassignment to the

1    case did not violate the constitutional judicial bias standards.  (*People v.*
     *Freeman, supra,* 47 Cal.4th at pp. 999-1000, 1006, 103 Cal.Rptr.3d 723, 222
2    P.3d 177.)  Because the recusal of the entire bench was premised on the same
     grounds as Judge O'Neill's recusal, it follows that there is no viable statutory or
3    constitutional argument premised on recusal of the entire bench.  Accordingly,
     Freeman's claim of ineffective representation is unavailing.  We summarily
4    deny the writ petition raising this claim.  (*People v. Duvall* (1995) 9 Cal.4th
     464, 475, 37 Cal.Rptr.2d 259, 886 P.2d 1252 [summary denial of writ petition
5    proper when petition fails to state prima facie case for relief]).)

6    (Resp't Lodgment No. 13 at 41-42.)

7         First, contrary to Freeman's assertion, in appellate counsel's answer brief to the

8    California Supreme Court, he argued at length that Judge O'Neill had recused himself for

9    "actual bias" and that O'Neill's comments and rulings during the trial suggested actual bias.

10   (Resp't Lodgment No. 10A at 5-15.)  Moreover, as discussed above, in section V(A)(2)(b) of

11   this Report and Recommendation, Freeman's claim that Judge O'Neill was actually biased is

12   without merit.  As such, Freeman has not shown she was appellate counsel was deficient or

13   that she was prejudiced by any failure to raise that issue on appeal.  *See Miller*, 882 F.2d

14   at1434.

15        In addition, appellate counsel had no basis to argue that the entire bench had been

16   recused from her case because, as both the appellate court and California Supreme Court

17   concluded, that claim had been forfeited by the failure to file a timely writ as required by

18   California law.  *See* Cal. Code Civ. Pro. § 170.3(d).  Thus, appellate counsel's decision not to

19   raise a meritless argument was not ineffective.  *Id.* at 1434.  Accordingly, the state court's

20   denial of this claim was neither contrary to, nor an unreasonable application of, clearly

21   established law.  The Court recommends the claim be DENIED.

22              **3.    *Failure to File Petition for Review of February 2007 Decision***

23        Freeman argues appellate counsel's decision not to file a petition for review of the

24   Court of Appeal's February 2007 decision amounted to ineffective assistance of counsel.  (*See*

25   Pet. at 31.)  Freeman raised this claim in her petition for review to the California Supreme

26   Court, and it was denied without comment.  (Resp't Lodgment Nos. 14, 15.)  Because there is

27   no reasoned state court decision to which this Court can defer, it must conduct an independent

28   review of the record to determine whether the state court's decision is contrary to, or an

                                          -68-

1    unreasonable application of, clearly established Supreme Court law.  *See Himes*, 336 F.3d at
2    853.

3          On February 5, 2007, the Court of Appeal concluded that Judge O'Neill's initial
4    recusal barred him from presiding over Freeman's trial and reversed her conviction.  (*See*
5    Resp't Lodgment No. 6 at 18.)  In the same opinion, the appellate court denied Freeman's
6    claims that there was insufficient evidence to support her convictions and that the solicitation
7    charge was proper under California law.  (*See id.* at 19.)  Freeman claims that appellate
8    counsel should have filed a petition for review of the claims the appellate court denied.

9          Appellate counsel's decision not to appeal the adverse determinations of the appellate
10   court was reasonable strategic decision, particularly in light of the fact that he had obtained
11   reversal of Freeman's conviction.  *See Jones*, 463 U.S. at  751; *see also Smith*, 140 F.3d at
12   1274 n. 4.  Moreover, as discussed above in sections V(B) of this Report and
13   Recommendation, sufficient evidence supported Freeman's convictions and the jury was
14   properly instructed.  Therefore, she has not shown she was prejudiced by appellate counsel's
15   strategic decision.[13]  *See Miller*, 882 F.2d at 1434.

### 4.    Failure to Raise Ineffective Assistance of Counsel Claim

17         Freeman argues appellate counsel should have raise an ineffective assistance of
18   counsel claim on appeal.  As discussed at length in section V(D), The Court has already found
19   that petitioner has not established that her trial counsel was ineffective.  It follows that any
20   claim for ineffective assistance of appellate counsel based on a meritless and unsuccessful
21   claim of ineffective assistance of trial counsel must also fail.   Appellate counsel's failure to
22   raise it cannot constitute ineffective assistance.  *See Miller*, 882 F.2d at 1434.

23         Furthermore, appellate counsel is not required to raise every non-frivolous issue
24   desired by defendant.  *Jones*, 463 U.S. 745, 751–54 (1983).  Because petitioner suffered no
25   prejudice from trial counsel's failure to raise these claims, appellate counsel's failure to raise
26   the same claims cannot be held to have been deficient.

27

28

---

[13] Freeman ultimately filed her own petition for review and the California Supreme Court denied it.  (Resp't Lodgment Nos. 7B, 8.)

1 | / / /

2 | **5.**      *Failure to Argue Two Witnesses are Required to Prove Solicitation*

3 | In her Traverse, Freeman claims appellate counsel was ineffective in failing to argue

4 | that a second witness is required to prove solicitation to commit kidnaping.[14]  (Traverse at 51.)

5 | As discussed in section V(B)(4) of this Report and Recommendation, under California law

6 | solicitation may be established by "the testimony of two witnesses, *or of one witness and*

7 | *corroborating circumstances.*"  Cal. Penal Code §653f(f) (emphasis added).  There was

8 | sufficient corroborating evidence to support the jury's verdict.  As such, Freeman has not

9 | shown appellate counsel was ineffective in failing to raise a meritless issue on appeal.  *See*

10 | *Miller*, 882 F.2d at 1434.

11 | **6.**      **Conclusion**

12 | In sum, based on the foregoing, the state court's denial of Freeman's ineffective

13 | assistance of appellate counsel claims was neither contrary to, nor an unreasonable application

14 | of, clearly established federal law.  *See Williams*, 423 U.S. at 412-13; *see also Himes*, 336

15 | F.3d at 853.  The court recommends the claims be DENIED.

16 | **G.      Actual Innocence**

17 | As she did in her petition for review to the California Supreme Court, Freeman states

18 | several times in her Petition that she is innocent.  (*See e.g.* Pet. at 1; Resp't Lodgment No. 14

19 | at 3.)  To the extent she is attempting to raise an actual innocence claim, she is not entitled to

20 | relief.  Whether a freestanding innocence claim is cognizable under federal law is an "open

21 | question."  *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71

22 | (2009).  Assuming such a claim is cognizable on federal habeas, the burden of proof for an

23 | such a claim is "extraordinarily high."  *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir.

24 | 1997)."A habeas petitioner asserting a freestanding innocence claim must go beyond

25 | demonstrating doubt about his guilt and must affirmatively prove that he is probably

---

27 |     [14]   The Ninth Circuit has held that a claim raised in a Traverse need not be considered.
28 | *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  Nonetheless, this Court will exercise its discretion to do so.  *See Brown v. Roe*, 279 F.3d 742, 744 (9th Cir. 2002) (stating a district court "has discretion, but is not required to" consider evidence and claims raised for the first time after the filing of the petition) (quoting *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000)).

1   innocent." *Id.* (citing *Herrara*, 506 U.S. at 442-44).   An actual innocence claim must be

2   based on "new reliable evidence" not presented at trial.  *Schlup v. Delo*, 513 U.S. 298, 324

3   (1995); *see also Shumway v. Payne*, 223 F.3d 982, 990 (9th Cir. 2000).  Here, Freeman offers

4   no "reliable new evidence" to support her claim.  For the reasons discussed in section V(B) of

5   this Report and Recommendation, the Court recommends this claim be DENIED.

6       **H.    Request for Evidentiary Hearing**

7       In her Traverse, Freeman requests an evidentiary hearing in order to resolve with

8   regard to her ineffective assistance of trial and appellate counsel claims.  (Traverse at 1-2.)

9   This request, however, is foreclosed by the Supreme Court's decision in *Cullen v. Pinholster*,

10  563 U.S. – ; 131 S.Ct. 1388, 1402 (2011).  There, the Supreme Court held that where habeas

11  claims have been decided on their merits in state court, a federal court's review under 28

12  U.S.C.§ 2254(d)(1) – whether the state court determination was contrary to or an

13  unreasonable application of established federal law – must be confined to the record that was

14  before the state court.  *Pinholster*,131 S.Ct. at 1398.  The Court specifically found that the

15  district court should not have held an evidentiary hearing regarding *Pinholster's* claims of

16  ineffective assistance of counsel until after the Court determined that the petition survived

17  review under section 2254(d)(1).  *Id.* at 1398; *see also Gonzalez v. Wong*,667 F.3d 965, 979

18  (9th Cir. 2011).  Here, the Court has determined that none of Petitioner's claims survive

19  review under section 2254(d)(1).  Therefore, the Court recommends Freeman's request for an

20  evidentiary hearing be DENIED.

21  / / /

22  / / /

23      **VI.    CONCLUSION AND RECOMMENDATION**

24      For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court

25  issue an Order: (1) approving and adopting this Report and Recommendation, and (2)

26  directing that Judgment be entered **DENYING** the Request for an Evidentiary Hearing and

27  **DENYING** the Petition.

28      **IT IS ORDERED** that no later than **August 22, 2012**, any party to this action may file

1  written objections with the Court and serve a copy on all parties.  The document should be

2  captioned "Objections to Report and Recommendation."

3        **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

4  Court and served on all parties no later than **September 5, 2012.**  The parties are advised that

5  failure to file objections within the specified time may waive the right to raise those objections

6  on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998);

7  *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

8        **IT IS SO ORDERED**.

9  DATED:  July 31, 2012

10

11                                Hon. Mitchell D. Dembin

12                                U.S. Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28